## ST. PAUL, MINNEAPOLIS AND MANITOBA RAILWAY COMPANY *v.* PHELPS.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF MINNESOTA.

No. 26. Argued and submitted November 6, 1890. — Decided December 22, 1890.

The grant of lands to the Territory of Minnesota by the act of March 3, 1857, 11 Stat. 195, c. 99, and the grant to the State of Minnesota by the act of March 3, 1865, 13 Stat. 526, c. 105, were grants *in praesenti*, and took effect by relation upon the sections of land as of the date of the grant, when the railroads were definitely located, both as to so much of the grants as was found within the limits of the State of Minnesota as defined by the act admitting it as a State, and as to so much thereof as was within the limits of the Territory of Minnesota under the territorial organization of 1857, but was not within the limits of the State when admitted as a State.

It cannot be safely asserted that it has been the general policy of the United States government to restrain a grant of land made to a State in aid of railways, to lands within such State, when a part of the line of road extends into one of the Territories.

Where the language of a series of statutes is dubious, and open to different interpretations, the construction put upon them by the Executive Department charged with their execution has great and generally controlling force with this court; but where a statute is free from all ambiguity, the letter of it is not to be disregarded in favor of a presumption as to the policy of the government, even though it may be the settled practice of the Department.

Congress may authorize a territorial corporation to construct a railroad in a Territory, and may make land grants in aid thereof, which will be valid after a part of the Territory becomes a State.

The various land grant statutes reviewed.

Lands within Indian Territory, covered by said grant of March 3, 1857, passed on the extinguishment of the Indian title.

IN EQUITY, to quiet title. The case is stated in the opinion.

*Mr. S. U. Pinney* for appellant.

*Mr. James McNaught, Mr. A. H. Garland* and *Mr. H. J. May,* for appellee, submitted on their brief.

MR. JUSTICE LAMAR delivered the opinion of the court.

This was a suit in equity brought by the St. Paul, Minneapolis and Manitoba Railway Company, a Minnesota corporation, against Ransom Phelps, to quiet the title to about 80 acres of land in Richland County, North Dakota, particularly described as the east half of the southeast quarter of section 13, township 132, range 48, alleged to belong to the plaintiff, and which was claimed by the defendant.

The bill was filed April 29, 1884, and set forth at great length the various steps by which the plaintiff derived its claim of title, averred that the defendant had no valid title to the land, by reason of plaintiff's prior right in the premises, and prayed that its own equitable title be quieted and protected, and the defendant be enjoined from setting up any claim whatever to the land, and for other and further relief, etc. The defendant answered, denying all the material allegations of the bill, and the plaintiff filed a replication. The case was tried upon an agreed statement of facts, and on the 3d of March, 1886, the Circuit Court announced its decision and opinion in writing, pursuant to which it ordered that the bill be dismissed at complainant's cost. The opinion is reported in 26 Fed. Rep. 569. On the 4th of March, 1886, a final decree was entered, dismissing the bill of complaint, and an appeal to this court was taken and allowed.

The material facts in the case are, briefly, as follows : The plaintiff claims the land in dispute as the present beneficiary under the acts of Congress approved March 3, 1857, 11 Stat.

195, c. 99; and March 3, 1865, 13 Stat. 526, c. 105, making a grant of lands to the Territory of Minnesota, to aid in the construction of railroads. The provisions of the act of 1857 material to this issue are as follows:

" *Be it enacted*," etc., "That there be and is hereby granted to the Territory of Minnesota, for the purpose of aiding in the construction of railroads, from Stillwater, by way of Saint Paul and Saint Anthony, to a point between the foot of Big Stone Lake and the mouth of Sioux Wood River, with a branch via Saint Cloud and Crow Wing, to the navigable waters of the Red River of the North, at such point as the legislature of said Territory may determine; from St. Paul and from St. Anthony, via Minneapolis, to a convenient point of junction west of the Mississippi, to the southern boundary of the Territory in the direction of the mouth of the Big Sioux River, with a branch, via Faribault, to the north line of the State of Iowa, west of range sixteen; from Winona, via Saint Peters, to a point on the Big Sioux River, south of the forty-fifth parallel of north latitude; also from La Crescent, via Target Lake, up the valley of Root River, to a point of junction with the last-mentioned road, east of range seventeen, every alternate section of land, designated by odd numbers, for six sections in width on each side of each of said roads and branches; but in case it shall appear that the United States have, when the lines or routes of said roads and branches are definitely fixed, sold any sections, or any parts thereof, granted as aforesaid, or that the right of preëmption has attached to the same, then it shall be lawful for any agent, or agents, to be appointed by the governor of said Territory or future State, to select, subject to the approval of the Secretary of the Interior, from the lands of the United States nearest to the tiers of sections above specified, so much land, in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold, or otherwise appropriated, or to which the rights of preëmption have attached, as aforesaid; which lands (thus selected in lieu of those sold, and to which preëmption rights have attached as aforesaid, together with the sections and parts of sections designated by

odd numbers as aforesaid, and appropriated as aforesaid) shall be held by the Territory or future State of Minnesota for the use and purpose aforesaid: *Provided,* That the land to be so located shall in no case be further than fifteen miles from the lines of said roads or branches, and selected for and on account of each of said roads or branches."

Section 3 provides: "That the said lands hereby granted to the said Territory or future State shall be subject to the future disposal of the legislature thereof for the purposes herein expressed and no other."

Section 4 defines the manner in which the lands granted shall be disposed of by the Territory or future State.

The act of '1865 enlarged the original grant from six to ten sections per mile on each side of the road, and the indemnity limits from fifteen to twenty miles.

To carry out the provisions of the granting act, the territorial legislature passed an act creating the Minnesota and Pacific Railroad Company, and bestowed upon it the lands which had been granted to the Territory; and by the same act the terminus of the main line of the road was fixed at Breckinridge, at the mouth of the Sioux Wood River, as the point "between the foot of Big Stone Lake and the mouth of Sioux Wood River," referred to in the act of Congress.

On the 5th of December, 1857, the company filed with the Commissioner of the General Land Office a map showing the definite location of the main line of the road as far west as Breckinridge; but as the public surveys at that time extended only to the west line of range 38 — about half the length of the road — it was not accepted as the map of definite location by the land office any farther west than the surveys extended. After the surveys had been completed as far west as Breckinridge, the company filed another map of definite location for the remaining part of the road, which was, in reality, a map of the original location made to conform to the public surveys. The exact date of the filing of this latter map and its acceptance by the land department does not appear in the record, but it was prior to May 25, 1869.

The railroad was completed to Breckinridge within the time

limited by the act of March 3, 1865, *supra.* It is conceded that the tract in controversy is part of an odd section lying within six miles of the line of the road, and that the appellant has succeeded to all the rights and privileges respecting the grant that were originally conferred upon the Territory of Minnesota and by its legislature conferred upon the Minnesota and Pacific Railroad Company.

The main contention of the appellee is, that this land, although within six miles of the line of the road as definitely located and as actually constructed, and otherwise conforming to the description of the lands granted by the act of 1857, was not granted by that act, because it lies outside of the limits of the present State of Minnesota, within what is now the State of North Dakota, although at the date of the grant it lay within the limits of Minnesota Territory. This contention is based upon the following theory: At the time the grant of 1857 was made Minnesota was a Territory, whose western boundary was the Missouri River. Five days prior thereto, to wit, February 26, 1857, Congress passed an enabling act for the proposed State, 11 Stat. 166, which designated the western boundary thereof as follows: "Beginning at the point in the centre of the main channel of the Red River of the North, where the boundary line between the United States and the British possessions crosses the same; thence up the main channel of said river to that of the Boix des Sioux River; thence [up] the main channel of said river to Lake Travers; thence up the centre of said lake to the southern extremity thereof; thence in a direct line to the head of Big Stone Lake; thence through its centre to its outlet; thence by a due south line to the north line of the State of Iowa." Under this enabling act the State of Minnesota was organized and admitted into the Union May 11, 1858. 11 Stat. 285. It is said that it has been the settled policy of the government to confine land grants made in aid of railroads wholly within a State or Territory to lands lying within the same State or Territory, and that, therefore, inasmuch as the land in this case is outside of the State of Minnesota, although within the limits of the Territory as it existed at the date of the grant, it cannot be in-

cluded in the grant to this branch of the road lying wholly within the State.

This was the conclusion reached by the Circuit Court, in view of the ruling of the land department and the refusal of the Secretary of the Interior, in the adjustment of the grant to this branch of the road, to certify to the State any lands lying beyond its western boundary line, which ruling the court expressed itself unwilling to reverse or to jeopardize the rights and large interests (including a prosperous village) that were said to have grown up on the faith of it. Against this conclusion there are strong, and, in our view, unanswerable, objections.

It was admitted that, according to the plain letter of the statute, the grant would include lands west of the Bois des Sioux River, in Dakota, and that the land in controversy is within that grant. It is also conceded that Congress has the power to grant to a State lands in another State or Territory, to aid in the construction of a railroad wholly within its own limits. But it is argued that the positive and express provision of the law must give way, and be controlled by the presumption founded upon an alleged policy of the government, that Congress, having in view the probable organization of Minnesota Territory into a State, intended to restrict the grant in question to lands within the limits of such future State. We see much in the act itself and in the circumstances which attended its enactment that repels such presumption. In the first place, what is called the uniform and settled policy of the government to confine land grants, in the manner described, as far as it exists, was established by the express provisions of statutory enactments, and not by any construction of the Interior and Law Departments of the government, wherein they have assumed to find an opposition between the actual text of the law, and the public policy of the government, making the former yield to the latter as expressive of the intent of Congress.

In most if not all of the grants of land made to the various States in aid of railroads within their respective limits, some words of limitation were used to denote that the grant was

restricted to lands within each particular State, when such restriction was intended. Thus, in the act of 1857 now under consideration, the terminus of the second line of road provided for was at "the southern boundary·of the Territory," and the terminus of the branch of that road was at the "north line of the State of Iowa." The act of June 29, 1854, 10 Stat. 302, c. 72, which was repealed August 4, 1854, 10 Stat. 575, c. 246, § 2, granted lands to the Territory of Minnesota to aid in the construction of certain railroads, one of which was to run from the southern line of the Territory via certain mentioned points to the eastern line of the Territory. The act of June 3, 1856, 11 Stat. 20, c. 43, granted lands to·Wisconsin in aid of a railroad from Fond du Lac northerly to the state line; and an act of the same date, 11 Stat. 21, c. 44, made a grant of lands to Michigan in aid of a road to run from Little Bay de Noquet via certain points to "the Wisconsin state line." The act of March 3, 1863, 12 Stat. 772, c. 98, granted lands to Kansas in aid of a railroad to run from Leavenworth via certain other points to the "southern line of the State;" and also in aid of a railroad to run from Atchison via Topeka to the "western line of the State." The act of May 5, 1864, 13 Stat. 64, c. 79, granted to the State of Minnesota to aid in the construction of a railroad from St. Paul to Lake Superior "every alternate section of public land, etc., within Minnesota." The act of July 4, 1866, 14 Stat. 87, c. 168, granted lands to Minnesota to aid in the construction of a road from Houston to the "western boundary of.the State," and for another road from Hastings to a point on the "western boundary of the State." The act of July 26, 1866, 14 Stat. 289, c. 270, § 28, granted lands to the State of Kansas to aid in the construction of a southern branch of the Union Pacific Railroad, which was designated to run from Fort Riley via certain named points to the "southern line of. the State of Kansas." See also the Florida-Alabama grant hereafter referred to; act of May 15, 1856, 11 Stat. 9, c. 28, granting lands to the State of Iowa to aid in the construction of certain railroads in that State; act of May 12, 1864, 13 Stat. 72, c. 84, granting lands to the State of Iowa to aid in the construction of a railroad in that State;

and act of July 2, 1862, 12 Stat. 503, c. 130, donating public lands to the several States and Territories which may provide colleges for the benefit of agriculture and the mechanic arts.

These statutes are all in harmony with the construction which we think should be put upon the act under consideration. In almost the same language in which those statutes grant lands to States, this act provides "that there be and is hereby granted to the Territory of Minnesota, for the purpose of aiding in the construction of railroads," and then proceeds, in words no less express and precise than the words of the statutes above cited, to define the lines of the different roads and branches, to designate the points of their termini, and to declare the terms, extent, location and limitations of the grants, all within the limits of the Territory. Not a word in any section or provision of the act indicates an intention of Congress to confine the grant within the limits of the contemplated State. The words of the grant are : ."Every alternate section of land designated by odd numbers for six [ten] sections in width on each side of each of said roads and branches." Each of what roads and branches ? Such as are by the express terms of the act confined within the proposed boundaries of the future State? The question is answered by the act itself. It provides for four separate roads and two branches, particularly designating the points from which each is to start, and the limits within which the terminus of each may be fixed. It expressly designates the terminus of the third of these roads (the Winona and St. Peters) at "a point on the Big Sioux River, south of the forty-fifth parallel of north latitude," some 30 or 40 miles beyond the boundary of the State; and that of the one under consideration which might have been, if so directed by the territorial legislature, also fixed beyond the western boundary, and yet be within the terms of the act. These provisions are all embodied in the same section, and all of them alike constituted legislation in reference to the proposed State, and if one was limited by the presumption of the rule of construction contended for, so were all the others. For they all prescribed with respect to the extent of the grant, the same terms, putting each grant on the same footing in proportion

to the length of the road; *i.e.* "every alternate section of land designated·by odd numbers for six [ten] sections in width on each side of each of said roads and branches." Again, it is to be observed, that after the State of Minnesota was organized and admitted into the Union, with its boundaries fixed by the enabling act, Congress passed an act, May 12, 1864, as to one of these roads, 13 Stat. 74, c. 84, § 7, and March 3, 1865, 13 Stat. 526, c. 105, as to. all the others, renewing the grant of 1857, and enlarging it from six to ten miles on each side of said roads and branches, and nothing is said in either of them to indicate any restriction to the State limits of the lands originally granted, or those added to the grant. We think that the language of those acts is too plain and unequivocal to need or even to admit the aid of an extrinsic rule of construction to get at the intent and meaning of Congress. The assumption of the appellee, that the uniform policy of the government, as it is called, arose from the construction put by the administrative department upon railroad grants, and that it arose with respect to the very first grant made by Congress in aid of a railroad, is erroneous. Counsel for the appellee have failed to bring to our attention any instance of such a construction, except the one now before the court. Had any such cases been presented when the language of the statutes under consideration was dubious and open to different interpretations, the established construction of them by the department charged with their execution would have very great force and generally a controlling one in the formation of the judgment of this court; but where a. statute, as in this case, is clear and free from all ambiguity, we think the letter of it is not to be disregarded in favor of a mere presumption as to what is termed the policy of the government, even though it may be the settled practice of the department.

We have already stated what we think the general policy established by Congress has been in respect to the restriction of land grants made in aid of railroads to be constructed wholly within a State or Territory; but we are of opinion that the alleged general policy of the government in the matter under consideration is hardly so broad as is claimed ·for it. We do

not think it can be safely asserted that it has been a general policy of the United States government to restrict a grant made to a State, in aid of railroads, to lands within such State, where a part of the line of road extended into one of the Territories. As we have already shown, that part of the grant to the Winona and St. Peters division, by the act of 1857, was never construed to have that effect.

Another case to which we now refer is conclusive upon that question. By the first section of the act of Congress of July 23, 1866, 14 Stat. 210, c. 212, there was granted to the State of Kansas, for the use and benefit of the St. Joseph and Denver City Railroad Company, a Kansas corporation, to aid in the construction of a railroad from Elmwood, Kansas, westwardly via Marysville in that State, so as to effect a junction with the Union Pacific Railroad, or any branch thereof, not further west than the one hundredth meridian of west longitude, every alternate section of land designated by odd numbers, for ten sections in width on each side of the road to the point of intersection. Such point of intersection was in what was then the Territory of Nebraska. The company filed a map of definite location of its line of road to a connection with the Union Pacific Railroad Company in Nebraska, March 25, 1870, and built sections of the road, from time to time, as far as Hastings, Nebraska, where it made a junction with the Burlington and Missouri River Railroad, July 15, 1872. It never made a junction with the Union Pacific Railroad unless the Burlington road is a branch thereof. The road as built did not follow its line of definite location, but deviated from it in some places a few rods, in others, several miles. The company filed its articles of incorporation in the office of the Secretary of State of Nebraska, April 1, 1873, but did not otherwise attempt to comply with the laws of that State in respect to foreign corporations extending their lines into that State. April 13, 1870, which was after the definite location of the road, one Van Wyck entered, at the Beatrice land office in Nebraska, a portion of an odd section of land in that State within ten miles of the road as definitely located and as actually built, and on the 15th of November, 1871, obtained a

patent therefor from the United States. The tract having been claimed by the railroad company, as a part of its grant, was sold by it to one Knevals, who brought suit in the Circuit Court for the District of Nebraska against Van Wyck, and obtained a decree in that court, declaring that Van Wyck had received his patent and the title it conveyed, in trust for the company, and that at the commencement of the suit he held the lands in trust for the complainant, to whom it was further decreed that he convey them. That decree was affirmed by this court at October term, 1882, the case being reported as *Van Wyck v. Knevals*, 106 U. S. 360. One of the defences interposed to the suit was that the company had not complied with the laws of Nebraska allowing foreign railroad corporations to extend their roads into that State. In treating of that point this court said (p. 369): "As to the want of compliance with the conditions imposed by the laws of Nebraska, allowing railroad companies organized in other States to extend and build their roads within its limits, it is sufficient to say that when the grant was made to the company Nebraska was a Territory, and it was entirely competent for Congress to confer upon a corporation of any State the right to construct a road within any of the Territories of the United States. The grant of land and a right of way for the construction of a road to a designated point within the Territory was sufficient authority for the company to construct the road to that point. It may be well doubted whether the State subsequently created out of the Territory could put any impediment upon the enjoyment of the right thus conferred."

Adopting the reasoning of the court in that case, we say that if it was entirely competent for Congress to confer upon a state corporation the right to construct a railroad in any of the Territories, and obtain lands in a Territory in aid thereof, *a fortiori*, might a territorial corporation, under congressional authority, construct a railroad in such Territory and obtain its full quota of lands, even though a part of the Territory embracing the granted lands should afterwards become a State.

The counsel for appellee, to sustain their statement as to the ruling and action of the administrative department upon the

land grant legislation, cite the construction given by Attorney General Crittenden to the act of September 20, 1850, 9 Stat. 466, c. 61, granting lands to the States of Illinois, Mississippi and Alabama, in aid of a railroad from Chicago to Mobile. The first section of that act granted a right of way one hundred feet wide through the public lands to the State of Illinois, for the construction of a railroad through the public lands within the same limits, followed by provisions, in the first six sections, declaring the terms, limitations and restrictions of the grant, with two other branches.

By the second section there was granted to the State, for the purpose of aiding in the construction of such railroad and branches, every alternate section of public land designated by even numbers, for six sections in width on each side of said road and branches. The third, fourth, fifth and sixth sections detailed the manner in which the grant should be administered, etc., and the seventh section provided as follows: "That in order to aid in the continuation of said Central Railroad from the mouth of the Ohio River to the city of Mobile, all the rights, privileges and liabilities hereinbefore conferred on the State of Illinois shall be granted to the States of Alabama and Mississippi, respectively, for the purpose of aiding in the construction of a railroad from said city of Mobile to a point near the mouth of the Ohio River, and that public lands of the United States, to the same extent in proportion to the length of the road, on the same terms, limitations and restrictions in every respect, shall be, and is hereby, granted to said States of Alabama and Mississippi, respectively."

In the adjustment of the grant, the States of Alabama and Mississippi claimed the right to take lands not only for those portions of the road within the boundaries of those States, but also for that portion in Kentucky and Tennessee, and that question was submitted to the Attorney General for an opinion. In a well-considered and clear opinion that officer held that such claim of those States could not be sustained, and that each grant was confined to the portion of the line within the territorial limits of the grantee State. There is in that opinion not the slightest reference to the settled policy of

the government as a rule of construction, or as in any way indicating the intention of Congress; not the slightest hint that the words of the statute should be controlled by any presumption based on what is termed the public policy of the government, as to the restriction of land grants. His conclusion was based upon the language of the act, holding that "the meaning and intention of" Congress "as contained in the seven sections of the act will be expressed and clearly understood" by taking the first six sections of the act and applying them first to the State of Alabama and then to the State of Mississippi, etc. Quoting some of the words of the act, he says: "To give to those words a different construction . . . would lead to inexplicable difficulties and to consequences irreconcilable with plain provisions of the act." 5 Opinions Attys. Gen. 603.

The other case cited arose under the act of May 17, 1856, 11 Stat. 15, c. 31, granting lands to the States of Florida and Alabama "to aid in the construction of certain railroads in said States." The claim of the State of Alabama to select indemnity lands lying in Florida was denied by the then Attorney General upon the authority of the opinion of Attorney General Crittenden in the Alabama-Mississippi case above referred to. Neither of these cases supports the general policy contended for by the appellee, and each is entirely unlike the one under consideration, where the entire line of road and the entire grant of lands claimed by the appellant are within the limits of the Territory to which the grant was made as it then existed.

Furthermore, at the time the grant of 1857 was made, the State of Minnesota had no existence, and there was no absolute certainty of there being such a State before the road was definitely located and built. Congress was, therefore, very careful as to the terms in which the grant was made. In the granting clause the language is "that there be and is hereby granted to the *Territory of Minnesota*," etc., while in other parts of the act, even in the same section, the grant is referred to as having been made to the Territory *or* future State. It is thus seen that the language of the act was framed to pro-

vide for the administering of the grant either by the Territory or by the future State. The object to be accomplished was the building of railroads to those parts of the then Territory which were the most thickly settled, and thus give to the settlers so many highways of commerce to the Eastern markets; and it was of little concern to Congress whether the then Territory or the future State was the means of accomplishing the object. Now, had the grant been wholly administered by the Territory, the question under consideration would never have arisen. For had no State been created until after the grant was administered, it is not conceived how the question could have arisen. It hardly seems probable that Congress intended the grant to mean one thing if administered by the Territory, and another thing if administered by the State; or, to speak more accurately, that the grant should be of a certain extent if administered by the Territory, and be greatly diminished if administered by the State.

Again, it is settled law that railroad grants, such as the one under construction, are grants *in præsenti*, and take effect upon the sections of land, when the road is definitely located, by relation, as of the date of the grant. *Van Wyck* v. *Knevals*, 106 U. S. 360. Had this line of road been definitely located before the State of Minnesota was admitted — that is to say, if the right of the road had attached to its granted lands while Minnesota was yet a Territory — would it be seriously contended for an instant that the land now in dispute did not pass under the grant? We think not, and yet such is the legitimate consequence of the appellee's contention.

It is also urged that these lands did not pass under the grant of 1857, because at that time they were in the occupancy of the Sisseton and Wahpeton bands of Indians. The sixth section of the act, however, made provision for such an emergency. It is there declared as follows: "That, in case any lands on the line of said roads or branches are within any Indian territory, no title to the same shall accrue, nor shall the same be entered upon by the authority of said Territory or State until the Indian title to the same shall have been extinguished." By that section the right of Minnesota to

lands within the Indian country was made somewhat in the nature of a float, to become vested when the Indian title was extinguished. When the road was definitely located and the Indian title was extinguished, the land passed to the State for the benefit of the road. *Buttz* v. *Northern Pacific Railroad*, 119 U. S. 55. The title of the appellant is complete, and neither the appellee nor the Northern Pacific Railroad under which he claims ever had any title to the land in controversy.

It is immaterial that the appellant did not begin its suit at an earlier date. The decision against it by the Secretary of the Interior, in 1871, was not binding as to the law of the case, and the bringing of the suit in 1884 was in time.

*Decree reversed, and cause remanded to the Circuit Court with directions to enter a decree in consonance with this opinion.*