SOUTHERN RY. CO. v. MACHINISTS' LOCAL UNION NO. 14 et al.

(Circuit Court, W. D. Tennessee. October 1, 1901.)

1. INJUNCTION—LABOR STRIKES—GROUNDS OF EQUITY JURISDICTION.

The remedy in equity by injunction to restrain striking workmen from unlawfully interfering with the rights of nonunion workmen and their employers is an entirely independent one, arising out of the conditions of inadequacy of the other independent remedy by an action at law for damages, neither having any relation to the remedy by criminal prosecution, except that the criminal laws may be so effectively enforced that there will be no occasion to resort to them; and the inadequacy of the protection afforded under such laws, from whatever cause, affords the occasion and necessity for a resort to equity.

2. SAME.

A labor union conducting a strike, which maintains pickets and guards around the works of the former employer for the avowed purpose of preventing nonunion workmen from working therein, cannot avoid responsibility for personal assaults on such workmen, and other unlawful acts committed in direct furtherance of such purpose, because such acts were not committed by its orders, and perhaps not by its members, nor because it passed a resolution, not made public, counseling that peaceable methods alone be used, where it did not in any public way protest against or disown such acts, or take any measures to assist in preventing or punishing them. In such case the action of the union in attempting to enforce its unauthorized edict that no others should work for the employer by a display of force and the menace of its pickets must be held, for the purpose of an application for an injunction, to have been the direct inciting cause of whatever acts were committed by its own members or others in violation of the personal liberty of other workmen and for its benefit.

3. SAME—ACTS IN VIOLATION OF PERSONAL LIBERTY.

The members of a labor union, in obedience to orders from the central organization, went on a strike against their employer. The union established and maintained pickets around the shops of such employer, and its members climbed telegraph poles and fences to watch such shops, and gathered in numbers at the entrances, and sent violent abusive and threatening messages to workmen inside. They thrust themselves on unwilling workmen to argue and persuade, and in some instances personal assaults were made upon such workmen by strikers or their

111 F—4

friends. The effect was to drive away a number of the workmen through fear for their personal safety, while those who remained for the most part stayed inside the works, where they ate and were lodged. *Held*, that such acts were not within the right of peaceable and lawful persuasion, but were acts of menace and besieging, in violation of the personal rights of the workmen and their employer, which entitled the latter to an injunction.

4. SAME—ENTICING AWAY APPRENTICES—TENNESSEE STATUTE.

A statute of Tennessee. (Acts 1875, c. 93) provides "that hereafter it shall not be lawful for any person in this state knowingly to hire, contract with, decoy or entice away, directly or indirectly, any one, male or female, who is at the time under contract or employ of another." *Held*, that under such statute, as well as by the common law, it was unlawful for a labor union whose members were on a strike to endeavor, through a committee appointed for the purpose, to persuade apprentices under contract to work for their employer for a term of years to violate such contract and leave their employment, and that such attempts should be enjoined as an unlawful conspiracy where, if successful, the injury to the employer would be irremediable.

5. STATUTES—RULES OF CONSTRUCTION.

Where the language of a statute is unambiguous, and by its plain terms it applies to all persons, the courts are not authorized to limit it by construction to a particular class of persons upon some outside consideration, as of the supposed policy or reason which led to its enactment.

In Equity. Suit to enjoin the continuance by defendant labor union and its members of alleged unlawful acts. On motion for preliminary injunction.

F. P. Poston, for plaintiff.

A. B. Pittman, for defendants.

HAMMOND, J. Adhering as I do to the opinion expressed in the case of American Steel & Wire Co. v. Wire Drawers' & Die Makers' Unions Nos. 1 and 3 (C. C.) 90 Fed. 598, and believing that this case, like that, is to be governed by the case of In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092, nothing further need be said as to the law of this case. And it only requires that we shall give attention to the facts proven, in order to determine if they justify the same judgment as in those cases. But before doing this I wish to cite for our instruction an article which has fallen under my notice since the argument in this case began. It is entitled "Personal Liberty and Labor Strikes," and appears in the current October number of the North American Review (volume 173, p. 445). It is written by the Most Reverend Archbishop Ireland, and presents the law governing this case so accurately and tersely that I desire to adopt it as my own judgment, and to quote from it certain passages pertinent to this case. No lawyer or judge, within my reading, has stated the principles of judgment controlling the courts in these cases more aptly, though untechnically, than this learned prelate. Quoting, for illustration, from an English statute of 1875, passed for the aid and enlargement of the rights of the labor unions in conducting strikes, he calls attention to the prohibitions of that act defining what the strikers may not do. Now we have no act of congress or of the Tennessee legislature similar to that act of parliament, which was passed to confer upon labor unions larger powers because under the common law of conspiracy and the like

they could not do what the act permits, and it is this more restrictive common law which governs this and other American courts where no legislation has been had in aid of the strikers. Indeed, in Tennessee, as we shall see presently, what legislation we have is hostile to the strikers, and possibly more restrictive on them than the common law of the state otherwise would be. But the prohibitions of the English act formulate those of our own law and those which existed in England before their act, and they were only inserted lest the act itself might have been taken to abolish those prohibitions. This statement is supported by the Debs Case, and those which before or since have enunciated the same doctrine. For this court it is a closed question, by the authority of the supreme court of the United States, and no longer open for debate. We are not now concerned with what the strikers properly may do in furtherance of their strike, but only with what our law forbids them to do. It forbids, without statute, precisely the same things this English act forbids, and punishes criminally; and by the authority of the Debs Case a court of equity will, in a proper case, restrain by injunction the doing of those same things. These, as quoted by Archbishop Ireland, and approved by him as expressing the moral and Christian as well as the municipal law, are as follows:

"Every person who, with a view to compel any other person to abstain from doing or to do any act which such other person has a legal right to do, or abstain from doing, wrongfully and without legal authority uses violence or intimidates such other person, or his wife, or children, or injures property; or persistently follows such other person about from place to place; or hides any tools, clothes, or other property, owned· or used by such other person, or deprives him of, or hinders him in the use thereof; or watches or besets the house or other place where such other person resides or works, or carries on business or happens to be, or the approach to such house or place; or follows such person with two or more other persons in a disorderly manner or through any street or road, shall on conviction be punished as provided," etc.

The proof before us shows that the defendant strikers have violated every one of these prohibitions of our law, so conveniently formulated by this English statute, except hiding tools and intimidating the wives and children of the "scabs." Quoting from a South Carolina case in 1894, this distinguished priest, who lends his influence to correct the evil of unlawful violence in conducting strikes, again states the categories of unlawful acts thus:

"By threats, menace, intimidations, and opprobrious epithets addressed to plaintiff company's officers and workmen, and by gathering in crowds about the company's place of business and at the boarding places of their workmen, and by following said workmen to and from their work, stopping them on the highways, interfering with them in their work, and by holding them up to ridicule and contempt of bystanders."

Here again is a list of acts which is almost the same as in the above-quoted English statute that are not permitted to strikers, and the American cases could be cited in considerable numbers to the same effect; but, as before stated, it is no longer an open question since the decision of the Debs Case, and it is unnecessary to cite them here. This extract is made to say that the proof here shows that quite every one of the acts mentioned in the South Caro-

lina case above quoted has been committed by the defendant strikers in this case.

Archbishop Ireland also abstracts from a Massachusetts case the principle which forbids such conduct in the management of strikes. It finds expression in the title of his article, as it finds the most able exposition in his argument; and I wish I might quote the whole of it, but abstain, though the article is comparatively brief, considering the importance of the subject in the law of our social order. It is the principle of personal liberty so guarantied by our constitution that it is altogether doubtful if any kind of legislation could change the law so as to favor the labor unions by permitting them to secure their strikes by doing any of the now prohibited acts. The English parliament might do this, but it is not certain that any American legislature, state or national, could. Says the Massachusetts case quoted by the archbishop:

"Freedom is the policy of this country. But freedom does not imply a right in one person, either alone or in combination with others, to disturb or annoy another, either directly or indirectly, in his lawful business or occupation, for the sake of compelling him to buy his peace."

He states that the acts of violence and intimidation covered by the quoted statutes and decisions are less detrimental to personal liberty than those that happen under our own eyes, and expresses wonder that in America, where personal liberty is best safeguarded, "such things are tolerated by state authorities who are either unwilling or unable to repress them," which is really the chief reason why resort must be had to the courts of equity; ordinary police protection being ineffective in fact, whatever cause may produce that inefficiency, as to which cause it is not necessary that the court of equity should inquire, the condition of nonprotection in fact being all with which it is concerned.

The suggestion that the same constitution which safeguards the personal liberty of the "scab" and his employer guaranties to, its violators trial by jury for their crimes or offenses arising out of the violation is not an answer to the fact that prosecutions and consequent convictions are either wholly wanting or ineffective for the protection of the "scabs" and their employers. The Debs Case settles that the same constitution also guaranties the equitable remedy. It is not, indeed, as the able counsel of defendants argued that it is not, a concurrent remedy with that afforded by criminal prosecution; and it is one dependent, as he says, upon conditions among which mere police failure is not included, but that failure is none the less the occasion of the resort to equity,—the paramount necessity for it. The equitable remedy is a wholly independent one, arising out of conditions of inadequacy of that other likewise wholly independent remedy of an action at law for damages; and upon neither of these does the remedy of criminal prosecution have the least bearing, except that, if the criminal law be so thoroughly executed that there could be no violations of or offenses against the personal liberty of the "scabs" and their employers, there would then be no occasion for actions at law for damages or bills in equity for injunction. That is all the relation that the criminal law has to

such suits as this. In re Debs, 158 U. S. 564, 594, 15 Sup. Ct. 900, 39 L. Ed. 1092. On this view it may be conceded, also, that while in the Cleveland Strike Case, cited in the beginning of this opinion, as counsel says, there was sympathy with the striking violators of the law and helpful abstention by the police from all interference, here the proof shows that the mayor and chief of police allowed the special policemen selected and paid by the plaintiff company to guard the workshop, and refused the demand of the strikers that they should be removed. Still this was not effective to stop the unlawful conduct of the strikers, and, in any event, has no bearing on the right of the plaintiff company to the relief asked, as we have endeavored to show.

Returning to the article already quoted, I may adopt from it the answer it makes to another argument made in this case,—that the labor union here impleaded is not responsible for the disorders proven, and that it set out to conduct the strike peaceably and according to lawful restraints. The writer says:

"And, indeed, acts of violence do occur in connection with strikes, which the labor unions do not approve, and for which they cannot be held responsible. Is it not, however, true that much at least of the interference with personal liberty of which we complain is the direct act of the unions? Are not the pickets of the unions usually the first to have recourse to threats and violence? And, even where mobs are the guilty party, are not the unions indirectly responsible? Should they not have foreseen the acts to which the mobs so easily resort, and should they not have taken measures to obviate such acts? Should they not at least protest when such acts have unfortunately taken place?"

So it was here. There was no protest by this labor union, No. 14, when Williams was assaulted, beaten, locked in a box car, and shipped out of town on another railroad, nor when Ridge was assaulted and beaten. No steps were taken to expel from the union these violators of the law and of the personal liberty of the "scabs" and their employers, nor to censure them, nor to discover them to the police. Absolutely nothing was done in this way to disown these acts, and now the only reliance is that the original minutes of the union counseled and directed there should be no violence, of which it is not shown that the "scabs" ever had any notice. How could they know that the union repudiated these assaults which deterred them and kept them besieged in their workshops? The union, conducting the strike on orders from Toronto, Canada, a foreign country, by the way, got the benefit of whatever force lay in these assaults as an example of what could be done if the edict of the union that none should work for the plaintiff company were not obeyed. It was an ever-present force, and, under the circumstances of picketing and beleaguerment, had all the effect of an army with banners, as a force threatening and deterrent; and I have no doubt it was so intended by the strikers who used it, whether the union approved it or not. Its effect on the "scabs" was instantaneous, and it seriously injured the plaintiff company's efforts to supply laborers. Forty or fifty left and refused to work. Some, no doubt, through "persuasion" and voluntarily, but, equally without doubt, some through fear of this and other threats of violence; and as to these last the right of per-

sonal liberty to work, if one wishes, without fear, was violated. And it is "a right of which no men can with any shadow of equity deprive another." North Am. Rev. vol. 173, p. 448. If it be said that a striking workman "has a sort of proprietary interest in his place, and that when another steps into it he is an unjust aggressor, who deserves to be summarily dealt with; that strikes must fail if employers are.allowed to fill the places of strikers; and that compulsion brought to bear on nonunion men to prevent them from working is necessary as a measure of war, and therefore justifiable,"—the reply is that "statements of this kind, however, are social sophistries, which, if put into practice, would speedily undermine the structure of civil society." And "if strikes necessarily require, as a condition of success, the violation of personal liberty and the subversion of social order, then strikes stand self-condemned." Id.

Enough has been said to show that the court is of the opinion that the defendants are responsible for the assaults upon and the beating of Williams and Ridge, the ugly details of which need not be given. If we were trying the defendants upon indictments or as a police magistrate, possibly the proof would fall short of conviction, upon the ground of a reasonable doubt, though even that may be questionable. But, whether any of the named defendants made those assaults or not, they were made in their behalf and for their benefit, and in aid of their strike. That is sufficient. If the picketing, the climbing of the adjacent telephone poles, the climbing upon the fences, the watching of the shops, the assemblies in the streets and at the entrances and the constant and unceasing surveillance had been confined to obtaining information and to unobjectionable social intercourse, for the purpose of begging and entreating not to work, there could be no injunction. But the thrusting themselves upon unwilling "scabs" to "argue"; "persuading," picketing, climbing poles and fences, as an exhibition of force and threats, accompanied by such assaults as have been mentioned; violent, abusive, and threatening messages sent to "scabs" inside, and the like, as shown in this proof,—come clearly within the decisions against such conduct. The character of these acts is conclusively shown by the fact that many, if not all, who left were made afraid, and by the fact that those who remain and are at work feel the necessity of keeping inside the plaintiff's yards, lodging and eating there in places provided for them by the plaintiff. In fact, they are besieged, and act wisely to keep inside, in view of what has been done and may yet be done if not enjoined. The proof convinces me of this. These defendants and other strikers similarly situated, in effect and by their conduct, have assumed that "scabbing" is as much an offense against municipal and social law as it is against the law of their labor unions, and therefore that all nonunion laborers are bound by their law, and may be made to respect it. Not being able to use the ordinary processes of the law of the land to enforce obedience to their strike law, they proceed to use such other force as they may command, it being such as they used in this case. It only requires a moment's reflection to see that this is an unjustifiable assumption, and imposes upon nonunion laborers and all employers of labor, and indeed upon all other people, the most detestable of

all tyrannies,—laws made without representation in the law-making body. The assumption and insistence on obedience to it are of themselves unlawful whenever the insistence takes the form of compulsion, be the force used what it may. And, if there be the elements of compulsion in fact, it is idle to call it "persuasion" and "argument," and expect such a designation to relieve it of unlawfulness. Compulsion with a club is not "persuasion," even if the victim of the club be another man selected as an example of what a club may do. And so of any less violent force, if it be in fact a compulsory force. If I may be permitted to borrow the thought from Archbishop Ireland, the condemnation of these abuses against personal liberty, and the maintenance of the freedom to work and contract for work without any man's hindrance, "is to serve the cause of labor and labor unions."

The labor unions have gained the victory in the struggle which denied their own freedom to combine together to quit work collectively, and use such peaceable means as the law allows to promote their strikes. It took an act of parliament in England to enlarge this right against the common-law prohibitions of conspiracy and combinations to incite others to quit work. But our courts in America generally have yielded the enlarged right without a statute. So much gained for the sake of personal liberty by the strikers should induce them to yield the same rights of liberty to the "scabs"—a word I use because it is the technical word of the labor unions and the strikers—and their employers. The strikers cannot have, under the law of equal rights, a liberty of contracting as they please, working when they please, and quitting when they please, which does not belong alike to the "scabs" and their employers. And it is this right the courts of equity enforce by injunction. The supreme court of the United States has established that as the law of this case.

Attention has been called to an act of the Tennessee legislature (Acts 1875, c. 93, p. 168) entitled "An act to regulate contracts between employer and employé, and to impose a penalty for the violation thereof." It reads as follows:

"Section 1. That hereafter it shall not be lawful for any person in this state knowingly to hire, contract with, decoy or entice away, directly or indirectly, any one, male or female, who is at the time under contract or in employ of another; and any person so under contract or in the employ of another leaving their employ without good and sufficient cause, before the expiration of the time for which they were employed, shall forfeit to the employer all sums due for service already rendered, and be liable for such other damages the employer may reasonably sustain by such violation of the contract."

The second section imposes a liability for damages against any one violating the provisions of the first section by hiring, whether he knew of the prior contract or not, if, being notified, he does not discharge the laborer, etc. And the third section repeals all laws or parts of laws in conflict. Shannon's Code, § 4337 et seq. This act is perhaps only declaratory of the common law as against the laborer breaking his contract of service, and possibly as against one who "decoys" or "entices" him away and employs him for himself. Certainly it is against the common law for two or more to conspire to decoy or en-

tice him away with intent to injure the employer, if he be under a contract of service which he may not terminate without the consent of the employer. Arthur v. Oakes, 11 C. C. A. 209, 63 Fed. 310, 321, 25 L. R. A. 414. The statute, however, does not deal with such conspiracies directly, and can only be held to include them upon the theory that "any person" includes more than one, and that it is as much a violation of the statute for two or more to do the prohibited thing as it is for a single individual to so act. In this view the statute undoubtedly strengthens the plaintiff's case where a conspiracy is shown, as here, although it does only declare what, in respect of that, the law otherwise would be. For it is a legislative command that supersedes the old law, which is not repealed, however, where there is not a conflict. Also, in the same way, it strengthens the right to an injunction by a court of equity, which undoubtedly restrains such conspiracies, "in a proper case, if the injury threatened would be irremediable at law," says Justice Harlan in Arthur v. Oakes, 11 C. C. A. 220, 63 Fed. 321, 25 L. R. A. 429. This statute enlarges the remedy at law, possibly, as to single individuals, but not so, possibly, in equity, because "a court of equity," says the same high authority, "without exception, will not compel the actual, affirmative performance by an employé of merely personal services," even under a contract. Id., 11 C. C. A. 217, 63 Fed. 318, 25 L. R. A. 425. Nor does the injunction against conspiracies compel such performance, but only forbids others to incite or entice the employé to break his contract, with intent on the part of those others to injure the employer. Id. These considerations would be unimportant here if the proof did not show that there are employed by the plaintiff company "apprentices" under contract for a term of four years each to learn his trade in the machine shops of the plaintiff. The defendant union appointed a committee to see these "apprentices" and induce them to leave the service of the plaintiff company, and this the committee of strikers did, but without success, they being still in that service. That this was a violation of this statute, and of the common law as well, I have no doubt, and that its recurrence should be enjoined there can be no question. As to the other employés, there is no proof that they were under any time or other contract limiting their right to quit work at will, and as to them the case stands upon the other footing of this opinion already set out. The only cases where the supreme court of Tennessee has considered this statute, so far as counsel or the court are advised, are those of McCutchin v. Taylor, 11 Lea, 259, and Morris v. Neville, Id. 271. By these cases the statute was most rigidly enforced against those who had decoyed and enticed away the laborers. They were negro farm laborers in both cases,—certainly in one case, and presumably in the other; and I have no doubt, as counsel argue, that this statute was intended solely for that class of laborers,—agricultural farm hands,—and possibly to prevent housewives from decoying or enticing away each other's cooks or other servants. But this nowhere appears on the face of the statute, or otherwise in any other way than as an inference to be drawn from what counsel and the court

know of the political and industrial conditions of this section of the country. It may be conceded that it is not at all likely that a Tennessee legislature intended to make by this statute a law against strikes and strikers and the labor unions. See Acts Tenn. 1901, p. 146, c. 104. But this consideration cannot control the courts in the construction of the statute, if it be broad enough in the language used to cover the case of strikes and the labor unions. If a legislature intends to limit its enactment, they must do so by the terms of the act itself, and no other limitation is authoritative where the language is unambiguous and construes itself. It is not permissible to go outside a statute plain in its words, as covering all labor contracts and laborers, and to say, on any consideration whatever, that there was an intention to limit it to a particular class of laborers, white or black, or however else such classification may be made, as of agricultural or industrial workmen; not when the subject-matter and the language used comprehend both these and all other classes. Particularly is this so under constitutions forbidding race and class distinctions. If the legislature intended to limit this act to farm laborers, they should have said so, if they have the constitutional power to so limit such an act, as to which I express no opinion, because the act expresses no such limitation, and we cannot add it to the words of the act. Mr. Justice Lamar makes this familiar principle so plain by his statement of the reasons for it that any other citation is scarcely necessary than the case of Lake Co. v. Rollins, 130 U. S. 662, 9 Sup. Ct. 651, 32 L. Ed. 1060. There are cases where the political and industrial conditions might interpret a statute, but, as Mr. Justice Lamar says of governmental policy, it is only in cases where the statute is dubious, and open, on the face of it, to differing interpretations. Railroad Co. v. Phelps, 137 U. S. 528, 11 Sup. Ct. 168, 34 L. Ed. 767. In the latest case on the subject Mr. Justice Harlan says:

"Our province is to declare what the law is, and not, under guise of interpretation, or under the influence of what may be surmised to be the policy of the government, so to depart from sound rules of construction as in effect to adjudge that to be law which congress has not enacted as such. Here the language used by congress is unambiguous. It is so clear that the mind at once recognizes the intent of congress. Interpreted according to the natural import of the words used, the statute involves no absurdity or contradiction, and there is consequently no room for construction. Our duty is to give effect to the will of congress, as thus plainly expressed." Dewey v. U. S., 78 U. S. 510, 521, 20 Sup. Ct. 981, 985, 44 L. Ed. 1170, 1174.

See, also, U. S. v. Fisher, 2 Cranch, 358, 399, 2 L. Ed. 304, where Mr. Justice Washington considers the subject with his unfailing accuracy of statement and ability. Mr. Justice Brown reviews the cases most instructively in Hamilton v. Rathbone, 175 U. S. 414, 419, 20 Sup. Ct. 157, 44 L. Ed. 221, and thus enunciates the universal rule of the courts:

"The general rule is perfectly well settled that where a statute is of doubtful meaning, and susceptible upon its face of two constructions, the court may look into prior and contemporaneous acts, the reason which induced the act in question, the mischiefs intended to be remedied, the extraneous circumstances, and the purpose intended to be accomplished by it, to determine its proper construction. But where the act is clear upon its

face, and when standing alone it is fairly susceptible of but one construction, that construction must be given to it."

On this rule it is impossible for us to go outside the statute of 1875 and say that the Tennessee legislature only intended it to apply to "farm hands." It must be taken to mean what it says, "that it shall not be lawful for any person in this state, knowingly, to hire, contract with, decoy or entice any one, male or female, who is at the time under contract or in the employ of another," etc. Laws 1875, c. 93, § 1. This statute may impose a servitude upon freemen that they shall not, at will, break their contracts of labor, or hire to others, nor shall others be free to hire them; but if so, the fault is not that of the courts called upon to construe its plain words that have no ambiguity or limitation, and here they include these defendants, so far as the statute is applicable as above indicated.

Injunction granted upon bond of $1,000, and on condition that plaintiff shall immediately pay the reasonable compensation of the special examiner and the stenographer. This condition is attached because the technical judgment for costs cannot be now given, and it is only on a final hearing that the court can adjust them as between the parties, which matter is reserved. Meantime it is just that the plaintiff inaugurating this litigation should provide this extraordinary expense, so that the examiner and stenographer shall not wait for their fair compensation. But, the court being now advised that the parties have each paid one-half these expenses, the question of costs is reserved for final hearing as between the parties. So ordered.

## NOTE.

When the reading of the opinion had been finished, Judge HAMMOND said he would order the decree submitted by Mr. Poston, counsel for the railroad company, to issue against the defendants, with one important change. He had read it very carefully, and almost microscopically. As drawn by Mr. Poston, it was a general, sweeping decree, whereas he thought the relief sought should be from the commission of specific acts charged in the bill, and changed it accordingly.

The order as entered by the court was as follows:

"It is hereby ordered, adjudged, and decreed that the Machinists' Local Union No. 14, of Memphis, Tennessee, and W. J. Adams, as president, and F. W. Borsch, as secretary thereof, and F. Baker, G. W. Buckalew, W. M. Cooper, D. J. Farrell, W. S. Griswold, F. Henze, F. B. Hazlewood, T. T. Kearney, J. Williamson, J. Mommens, J. P. Stanton, Charles Wise, C. P. Marshall, Jr., L. E. Turner, Sam Turner, C. D. Bailey, C. F. Bailey, George West, and John Boschart, as individuals and as members of said Machinists' Local Union No. 14, and any and all other persons associated with them in committing the acts of grievances complained of in said bill, be, and they are hereby, ordered and commanded to desist and refrain from in any manner interfering with, hindering, obstructing, or delaying any of the business of the Southern Railway Company, or its agents, servants, or employés in the discharge of their duties as such, in the operation of said railway and in the machine shops of said company at Memphis or elsewhere by trespassing on or entering upon the grounds and premises of said company, or within its yards or depots, for the purpose of interfering therewith, or hindering or obstructing its business in any manner whatsoever, or with the purpose of compelling or inducing, by threats, force, intimidation, violence, violent or abusive language, or persuasion, any of the employés of said Southern Railway Company to refuse or fail to perform their duties

as such employés; also from compelling or inducing or attempting to compel or induce, by threats, intimidation, force, or violence, or abusive or violent language, any of the employés of said company to leave its service or fail or refuse to perform their duties as such employés, or to compel or attempt to compel, by threats, intimidation, force, violent or abusive language, any person desiring to seek employment in said shops from so accepting employment therein; also from entering upon or establishing a picket or pickets of men on or patrolling its trains entering or about to enter or leaving or about to leave the city of Memphis, for the purpose of inducing or compelling, by threats, intimidation, violence, violent or abusive language or persuasion, any employé of said company to fail or refuse to perform his duties as such, or for the purpose of interviewing or talking to any person or persons on said train or trains coming to Memphis to accept employment with said company, for the purpose and with the intention of inducing or compelling them, by threats, violence, intimidation, violent or abusive language, persuasion, or in any other manner whatsoever, to refuse or fail to accept service with said company; also from compelling or inducing or attempting to compel or induce by threats, force, intimidation or violent or abusive language, any employé of said Southern Railway Company to refuse or fail to perform their duties as such employé, and from compelling or attempting to compel or induce, by threats, intimidation, force, or violence, or abusive or violent language, any such employé to leave the service of the complainant, and, by like methods, to prevent or attempt to prevent any person desiring to accept employment with said Southern Railway Company in its shops at Memphis or elsewhere from doing so by threats, violence, force, intimidation, or violent or abusive language; also from piling brick or other objects against or on the fences of said Southern Railway Company inclosing its said yards and shops in the city of Memphis, and from climbing or attempting to climb on, upon, or over said fences, or from looking through the cracks or holes in said fences, for the purpose of interviewing or talking to employés of said company working in said yards and shops, in order to induce them to leave the service of said company; also from climbing telegraph, telephone, or other poles in or on the sidewalk and near to or adjoining said fences inclosing complainant's yards and shops, for the purpose of halloaing or beckoning to said employés whilst in or at work in said yards or shops to come to the fence to be talked to by them, in order to induce said employés to leave the service of the complainant; also from sending or carrying into said yards or shops hostile, threatening, or abusive language or messages to and of the employés working therein, for the purpose of forcing or inducing or attempting to force or induce said employés or any of them to leave the service of said company, or to fail or refuse to perform their duties as such; also from interfering in any manner whatsoever, either by threats, violence, intimidation, persuasion or entreaty with the apprentices now at work in the shops of said railway company, in order to entice or induce them, or either of them, to quit the service of said company, or to fail or refuse to perform their duties as such apprentices, and from ordering, aiding, directing, assisting, or abetting in any manner whatsoever any person or persons to commit any or either of the acts aforesaid; and the said defendants, and each of them, are forbidden and restrained from congregating at or near the premises of the said Southern Railway Company in the city of Memphis, and from picketing or patrolling said premises, for the purpose of intimidating its employés or coercing them by threats, intimidation, violence, abusive or violent language, or preventing them, in the manner aforesaid, from rendering their service to said company, and, in like manner, from inducing or coercing them to leave the employment of said Southern Railway Company, and from in any manner so interfering with said company in carrying on its business in its usual and ordinary way, and from interfering, by threats, intimidation, violence, violent or abusive language, any person or persons who may be employed or seeking employment by said Southern Railway Company in the operation of said railway and shops; and the said defendants, and each and all of them, are hereby restrained and forbidden, either singly or in combination with others, from collecting in and about the ap-

proaches to said depot and yards for the purpose of picketing or patrolling or guarding the streets, avenues, gates, and approaches to the property of said company for the purpose of intimidating, threatening, or coercing any of the employés of said company from work in said shops, or any persons seeking employment therein from entering into such employment, and from so interfering with said employés in going to and from their daily work in the yards and shops of said company; and defendants, and each and all of them, are enjoined and restrained from going, either singly or collectively, to the homes or boarding houses of complainant's employés, or any of them, for the purpose of intimidating or coercing any or all of them to leave the employment of complainant. It is further ordered that the aforesaid injunction and writ of injunction shall be in force and binding upon each of said defendants, and all of them, so named in said bill, from and after service upon them severally of a copy of this order by delivering to them a copy thereof, or by reading or offering to read the same to them, and shall be binding upon each and every member of said Machinists' Local Union No. 14 of Memphis, Tenn., from the time of notice or service of a copy of this order upon said W. J. Adams, president, and F. W. Borsch, secretary thereof, and other members of said union, parties defendant hereto, and shall be binding upon said defendants whose names are alleged to be unknown, from and after the service of a copy of this order upon them respectively by the reading of the same to them or by publication thereof, or by posting, and shall be binding upon said defendants and all other persons whomsoever who are not named herein, from and after the time when they severally have knowledge, by actual service, of publication of the entry of this order and of the existence of this injunction; this order to continue in effect until the further orders of this court, and conditioned on complainant first entering into bond in the sum of $1,000, conditioned for the payment of costs and moneys adjudged against them in case this injunction shall be dissolved; said bond to be approved by the clerk of this court."