69 U.S. 328 (1864)
2 Wall. 328
HARVEY
v.
TYLER.
Supreme Court of United States.

*334 Mr. J.H. Brown, for Harvey, plaintiff in error, and defendant below.
Mr. B.H. Smith, contra.
*338 Mr. Justice MILLER delivered the opinion of the court.
This case has been twice argued before this court. It involves the title to a hundred thousand acres of land. The oral argument has been able on both sides; but the manner in which the record brings the case before us, is one which we have repeatedly condemned, and which has sometimes precluded us from the consideration of points relied on by counsel as error.
It is a fair inference from the bill of exceptions that each of the three series of instructions refused was prayed and excepted to as a whole. If so, the proceeding was not only a clear violation of a rule of this court; but if any proposition in the series ought to have been rejected, then the court did not err in refusing the prayer, although there might have been propositions in the series, which, if asked separately, ought to have been given. The exception is a general one to the refusing the prayer of the plaintiffs in error, and to the granting the prayer of the defendants in error.[*]
*339 However it might pain us to see injustice perpetuated by a judgment which we are precluded from reviewing by the absence of proper exceptions to the action of the court below, justice itself, and fairness to the court which makes the rulings complained of, require that the attention of that court shall be specifically called to the precise point to which exception is taken, that it may have an opportunity to reconsider the matter and remove the ground of exception. This opportunity is not given when pages of instructions are asked in one prayer, and if refused as a whole, are excepted to as a whole. We may rightfully expect of counsel who prepare cases for this court, that they shall pay some attention to the rules which we have framed for their guidance in that preparation; as well as to those principles of law referred to, which are necessary to prevent the prayer that counsel has a right to make to the court for laying down the law to the jury, from being used as a snare to the court, and an instrument for perverting justice. These observations, which are of daily application in this court, are fully justified by a record, which shows forty-six propositions asked of a court at once, as a charge to a jury.
In the present case, while we are relieved from the necessity of examining the forty-three propositions asked by plaintiffs in error (three of the forty-six were granted), we are also relieved from any apprehension that this will work injustice; because the only three propositions asked and granted on the part of defendants in error, and to which by a little liberality we are able to hold the exceptions sufficient, involve all the questions of law which are entitled to consideration, if not all which were argued in the case.
One branch of the controversy  the one of engrossing importance  turns upon the validity of the orders made by the County Court of Kanawha County.
The court below instructed the jury that these orders "did exonerate the taxes delinquent on the land in controversy for the year 1831, and all years prior thereto," and it is the soundness of this instruction which we are first to consider.
*340 The plaintiffs in error contend that these orders are void, and therefore nullities, because the records of them do not show that several matters were proven, which are essential to the right of the party to have his lands thus exonerated.
Ten or twelve of these omissions are urged as applicable to one or the other, or both, these orders; some of which are founded in misconception of what the record contains; some on the absence of averments merely negative, such as the failure to allege that the land had not been vested in the Trustees of the Literary Fund; and all of them, except one or two which will be noticed hereafter, concern matters, which may well be supposed to have been substantiated by proof before the court; if we are at liberty to make any presumptions in favor of the validity of the orders of the court.
This brings us to the issue of law in the case. The plaintiffs in error maintain:
1. That the county court which made these orders is a court of inferior and special jurisdiction, and therefore every fact essential to authorize it to make such orders, must appear upon the record which the court makes of the transaction; or,
2. If the court is not held to be of this inferior and special character, that the statute confers upon it in this class of cases only such special jurisdiction, and that its orders are subject to the same rule in testing their validity.
It is certainly true that there is a class of tribunals, exercising to some extent judicial functions, of which it may be said, in the language of Chief Justice Marshall, that they are "courts of a special and limited jurisdiction, which are created on such principles, that their judgments taken alone are entirely disregarded, and the proceedings must show their jurisdiction."[*]
The first inquiry, then, on this subject, must be into the character of the County Court of Kanawha County, which rendered these judgments of exoneration.
The powers of these courts in Virginia were originally *341 conferred and prescribed by the act of 1792, and are to be found fully stated in section 7th of the act of 1819.[*] "The justices of every such court, or any four of them, as aforesaid, shall and may take cognizance of, and are hereby declared to have power, authority, and jurisdiction, to hear and determine, all cases whatsoever now pending, or which shall hereafter be brought in any of said courts, at common law or in chancery, within their respective counties and corporations, and all such other matters as by any particular statute is or shall be made cognizable therein." Section 8 provides, that said courts shall be holden four times per year for the trial "of all presentments, criminal prosecutions, suits at common law, and in chancery, where the sum or value in controversy exceeds twenty dollars, or four hundred pounds of tobacco."
It is impossible to come to any other conclusion from this statute, than that the county courts of Virginia were courts of general jurisdiction; and were inferior only in the sense that their judgments might be revised by some appellate tribunal. They were in no sense courts of special jurisdiction, and were unlike county courts in other States,  Kentucky, for example, in reference to which a Kentucky decision has been quoted to us,  which had no common law or chancery jurisdiction, whose principal functions were ministerial, in reference to the roads, bridges, and finances of the county, to which are sometimes added those judicial functions which relate to wills and the administration of the estates of decedents. These all differ widely from the county courts of Virginia, which have all those powers of general jurisdiction usually found in circuit courts, courts of common pleas, courts of chancery, and others of similar character.
In reference to all these the general rule is, that every presumption not inconsistent with the record, is to be indulged in favor of their jurisdiction; and their judgments, however erroneous, cannot be questioned, when introduced *342 collaterally, unless it be shown affirmatively that they had no jurisdiction of the case.[*]
In regard to the second proposition, it is not so easy to determine in all cases the principle which is to govern.
The jurisdiction which is now exercised by the common law courts in this country, is, in a very large proportion, dependent upon special statutes conferring it. Many of these statutes create, for the first time, the rights which the court is called upon to enforce, and many of them prescribe with minuteness the mode in which those rights are to be pursued in the courts. Many of the powers thus granted to the court are not only at variance with the common law, but often in derogation of that law.
In all cases where the new powers, thus conferred, are to be brought into action in the usual form of common law or chancery proceedings, we apprehend there can be little doubt that the same presumptions as to the jurisdiction of the court and the conclusiveness of its action will be made, as in cases falling more strictly within the usual powers of the court. On the other hand, powers may be conferred on the court and duties required of it, to be exercised in a special and often summary manner, in which the order or judgment of the court can only be supported by a record which shows that it had jurisdiction of the case. The line between these two classes of cases may not be very well defined nor easily ascertained at all times. There is, however, one principle underlying all these various classes of cases, which may be relied on to carry us through them all when we can be sure of its application. It is, that whenever it appears that a court possessing judicial powers has rightfully obtained jurisdiction of a cause, all its subsequent proceedings are valid, however erroneous they may be, until they are reversed on error, or set aside by some direct proceeding for that purpose. The only difficulty in applying the rule, is to ascertain the question of jurisdiction.
*343 Former adjudications of this court have done much to throw light upon this difficult point, and to settle the rules by which it may be determined. We will notice a few of the most important.
One of the earliest is the case of Kempe's Lessee v. Kennedy, 5 Cranch, 173. Certain acts of the legislature of New Jersey confiscated the property of those who had sided with Great Britain in the war of the Revolution. They conferred the power of ascertaining that fact by inquest instead of by regular indictment, in the inferior court of common pleas of each county. In an action of ejectment, brought in the Circuit Court of the United States by Grace Kempe, the defendants set up a title acquired under proceedings thus authorized. In this court, on error, it was argued that, as to these proceedings, the court must be considered as one of special and limited jurisdiction. But the court, by Chief Justice Marshall, said: "This act" (the statute of New Jersey), "cannot, it is conceived, be fairly construed to convert the court of common pleas into a court of limited jurisdiction in cases of treason." "In the particular case of Grace Kempe, the inquest is found in the form prescribed by law, and by persons authorized to find it. The court was constituted according to law; and if an offence punishable by the law had been in fact committed, the accused was amenable to its jurisdiction, so far as respects her property in New Jersey. The question whether this offence was or was not committed, that is, whether the inquest which was substituted for a verdict on an indictment, did or did not show that the offence had been committed, was a question which the court was competent to decide. The judgment was erroneous, but it was a judgment, and until reversed cannot be disregarded."
In the case of Voorhees v. The Bank of the United States,[*] the validity of certain proceedings in attachment were called in question, on the ground that the record of the court of common pleas, in Ohio, in which the proceedings were had, *344 did not show certain steps which the law required. The defendant in the attachment proceedings was a non-resident; yet his land had been levied on, condemned, and sold, without an affidavit, without notice by publication, without calling him three times, at three different terms of the court, and without waiting twelve months from the return of the writ, before the sale; all of which are specially required in the act regulating the proceedings. Here was a case of special and stringent proceedings in rem, in the absence of jurisdiction over the person, where material provisions of the law, for the protection of defendant's rights, were omitted, so far as the record showed. "It is contended," said this court, "by the counsel for plaintiffs in error, that all the requisitions of the law are conditions precedent, which must not only be performed before the power of the court to order a sale, or of the auditors to execute it, can arise, but such performance must appear in the record." This is precisely what is contended for in the case now before us, and the circumstances of this case and of that are remarkably similar in their relation to the principles which we are now discussing. The court said, in reply to this: "The provisions of the law do not prescribe what shall be deemed evidence that such acts have been done, or direct that their performance shall appear upon the record." "We do not think it necessary to examine the record in the attachment suit, for evidence that the acts alleged to have been omitted appear therein to have been done. Assuming the contrary to be the case, the merits of the present controversy are narrowed to the single question, whether this omission invalidates the sale. The several courts of common pleas of Ohio, at the time of these proceedings, were courts of general jurisdiction, to which was added, by the act of 1805, the power to issue writs of attachment, and order a sale of the property attached, on certain conditions; no objection, therefore, can be made to their jurisdiction over the case, the cause of action, or the property attached." "There is no principle of law better settled, than that every act of a court of competent jurisdiction shall be presumed to have been rightly *345 done, till the contrary appears." "If the defendant's objection can be sustained, it will be on the ground that this judgment is false, and that the order of sale was not executed according to law, because the evidence of its execution is not in the record. The same reason would equally apply to the non-residence of the defendant within the State, the existence of the debt due the plaintiff or any other creditor, which is the basis of the whole proceedings."
In the case of Thompson v. Tolmie,[*] a sale of real estate by three orphans of this city was assailed in this court on similar grounds: The court says: "Those proceedings were brought before the court collaterally, and are by no means open to all the exceptions which might be taken on a direct appeal. They may well be considered judicial proceedings; they were commenced in a court of justice, carried on under the supervisory power of the court to receiving its final ratification. The general and well-settled rule of law in such cases is, that when the proceedings are collaterally drawn in question, and it appears on the face of them that the subject-matter was within the jurisdiction of the court, they are voidable only." "If there is a total want of jurisdiction, the proceedings are void, and a mere nullity, and confer no right and afford no justification; and may be rejected when collaterally drawn in question."
Both these latter cases are cited, reaffirmed, and the doctrine amplified, in Grignon v. Astor.[]
The application of these principles to the case before us will be very obvious upon a slight examination of sections 21 and 22 of the act of 1831, which confers on the county courts the power to exonerate lands from delinquent taxes. We have already seen that they are courts of general jurisdiction. These sections authorize them, when certain facts are proved by the owner of the land, "to render judgment in favor of such person, exonerating the land;" "but no judgment shall be rendered except in the presence of the attorney for the commonwealth, or some other attorney *346 appointed by the court to defend the interest of the commonwealth. If the application shall fail, judgment shall be rendered against the applicant, and he shall be adjudged to pay costs." Now here are all the usual accompaniments of a judicial proceeding; a court of competent jurisdiction, parties, plaintiff and defendant, namely, the applicant and the State; a subject-matter of consideration, to wit, the exoneration of the land from delinquent taxes, and a judgment of the court, either establishing such exoneration, or that the claim to it is not a rightful claim, and in either case conclusive of that claim. Care is taken that the commonwealth shall be represented by capable counsel; and the only fact required by the act to appear on the record is the presence of such counsel. That the appearance of this fact on the record is made the only one essential to the validity of the judgment, is strong evidence that the other facts, on which the judgment of the court may depend, need not so appear.
The transcripts of the judgments of exoneration produced in this case, show that there were proper parties before the court, that the subject-matter of the exoneration of the land from delinquent taxes was before it, and that it rendered judgments exonerating it from all delinquent taxes. Can it be required to give validity to these judgments, that the record shall show that every fact was proved, upon which the judgment of the court must be supposed to rest? Such a ruling would overturn every decision made by this court upon that class of cases, from that of Kempe's Lessee v. Kennedy, already referred to, down to the present time.
It is urged that the 22d section of the act of 1831 was not intended to confer the right of exoneration as to taxes delinquent after the passage of the act.
If this were true, we do not feel sure that, under the principles just considered, it could invalidate the judgment of the court. It would be a mistake as to the law, which would make the judgment erroneous; but would it, therefore, be void? We do not, however, concur in this construction of the act. There is nothing in its language which limits this *347 relief to past delinquency, and it is a rule of construction, that all statutes are to be considered prospective, unless the language is express to the contrary, or there is a necessary implication to that effect. The powers of the court over this subject, it is true, is limited in point of duration to three years; but that period extends beyond the time when the taxes for the year 1831 would become delinquent, and would, therefore, seem to embrace them, unless expressly excluded. The third section of the act of December 16, 1831, and the second section of the act of March 10, 1832, both recognize and proceed upon this construction of these sections, and remove any doubt which may have existed on that subject.
It was in proof that, at the time these judgments were rendered, a considerable part of this one hundred thousand acre tract lay in other counties which had been created out of the County of Kanawha; and it is said, as to so much of said land, the judgments of the county court of that county were without jurisdiction.
The tract had always been listed for taxation as a unit, in the County of Kanawha, for the entire period of thirty-one years or more, to which the exoneration extended. The bill of exceptions states, that the land was uniformly charged with taxes there, and not elsewhere. It was these delinquent lists, returned regularly by the Auditor of the State to the county from whence they came, from which the owner desired to be relieved. An application to the court of a county where they did not exist, would have been unavailing. It would be sticking in the bark to say, that a party entitled to relief could not get it in one county because all the land did not lie there; nor in any other county, because no evidence of such delinquency appeared in the tax-lists of the latter to be exonerated. The land in question was charged with taxes nowhere but in Kanawha County, and in that county it was proper that the exoneration should be entered.
It is to be remarked of all these objections to the judgments of exoneration, that the parties who made them show no patent, or other title, from the State of Virginia, and are *348 setting up defects in those judgments, of which neither the State of Virginia, which was a party to the proceedings, nor the Trustees of the Literary Fund, who were entitled if they were invalid, have ever complained, or sought to take advantage. On the contrary, the Auditor of the State of Virginia, its official accounting officer, recognized these judgments as valid, by making entries in his books, to the effect that the taxes were released by them.
We are of opinion, therefore, that the first instruction given at request of plaintiffs was correct.
The second was to the effect that if some of the defendants had made entries and surveys of any part of the land in controversy, under which they were setting up claims to it, they were properly sued, although not in occupation of it at the time the suit was instituted.
The code of Virginia, as well as that of several other States, allows the action of ejectment to be brought against persons claiming title, or interests in the property, although not in possession. It says:[*] "The person actually occupying the premises shall be named defendant in the declaration. If they be not occupied, the action must be against some person exercising ownership thereon, or claiming title thereto, or some interest therein, at the commencement of the suit." If then there was a part of the tract claimed by some person, on which there was no occupant, the case existed which the second clause of the section provides for. The policy of this act is obvious. It is that persons out of possession, who set up false claims to land, may by a suit in ejectment, which is the legal and proper mode of trying title, have that claim brought to this test. The act provides that such a judgment is conclusive against all the parties; and thus the purpose of the law to quiet title by a verdict and judgment in such cases, is rendered effectual. The language of the code of New York is identical with that of Virginia on this subject. And the construction we have given to it was held to be the true one, by the Supreme Court of the former State.[]
*349 The third and last instruction given at the instance of plaintiffs, had reference to the question of adverse possession, in its relation to the statute of limitations. Its purport was that if plaintiffs' title was found to be the paramount title, and any of the defendants entered upon and took possession of the land, without title or claim, or color of title, that such occupancy was not adverse to the title of plaintiffs, but subservient thereto.
We think this law to be too well settled to need argument to sustain it. There must be title somewhere to all land in this country. Either in the Government, or in some one deriving title from the Government, State, or National. Any one in possession, with no claim to the land whatever, must in presumption of law be in possession in amity with and in subservience to that title. Where there is no claim of right, the possession cannot be adverse to the true title. Such is the rule given as recently as 1854, by the Court of Appeals of Virginia, in the case of Kincheloe v. Tracewells.[*] The court there says: "An entry by one upon land in possession, actual or constructive of another, in order to operate as an ouster, and gain possession to the parties entering, must be accompanied by a claim of title."[]
We have thus examined the points made by the exceptions to the instructions asked by plaintiffs and given by the court. If there are points made on the instructions prayed by defendants and refused by the court not embraced in those we have discussed, they are of minor importance, and do not affect the merits of the case.
JUDGMENT AFFIRMED.

[See supra, p. 210, Florentine v. Barton. REP.]
NOTES
[*] Rogers v. The Marshal, 1 Wallace, 644; Johnson v. Jones, 1 Black 209; Rule 88 of the Rules of this Court.
[*] Kempe's Lessee v. Kennedy, 5 Cranch. 173.
[*] 1 Revised Code, 246.
[*] Kempe's Lessee v. Kennedy, 5 Cranch, 173; Voorhees v. Bank of United States, 10 Peters, 449; Ex parte Watkins, 3 Peters, 193; Grignon v. Astor, 2 Howard, 319.
[*] 10 Peters, 449.
[*] 2 Peters, 157.
[] 2 Howard, 319.
[*] Chapter 135, § 2.
[] Banyer v. Empie, 5 Hill, 48.
[*] 11 Grattan, 605.
[] Society, &c., v. Town of Pawlet, 4 Peters, 504; Ewing v. Burnett, 11 Id. 52; Angell on Limitations, § 384, 390