## KELLEHER v. FRENCH, State Entomologist.

District Court, W. D. Virginia.   October 29, 1927.

1. **Agriculture ⬡1—Virginia law, authorizing destruction of host plants for cedar rust, held within police power (Laws Va. 1914, c. 36).**

Virginia "Cedar Rust" Law (Laws Va. 1914, c. 36), authorizing destruction of cedar trees, where they constitute menace to apple industry as being host plants for cedar rust, held not invalid, as not within police power of state, since

it is reasonable regulation of use of property in furtherance of public welfare.

2. **Constitutional law ⬡87—State cannot take one man's property for benefit of others, but may regulate enjoyment thereof.**

State cannot take one man's property for benefit of others, but it can say that, in enjoyment of property, owner shall not use it in such way as to endanger rights and property of others.

3. **Constitutional law ⬡278(1)—"Cedar Rust" Law, providing for destruction of host plant for cedar rust and inquiry by state entomologist on request of 10 freeholders, held not to deny due process (Laws Va. 1914, c. 36).**

"Cedar Rust" Law (Laws Va. 1914, c. 36), authorizing destruction of host plants for cedar rust, held not to deny due process and equal protection, because it provides that state entomologist shall make inquiry to ascertain existence of disease in trees on request in writing of 10 freeholders.

4. **Statutes ⬡47—"Cedar Rust" Law, using words "orchard" and "locality," held not invalid for vagueness and indefiniteness (Laws Va. 1914, c. 36).**

"Cedar Rust" Law (Laws Va. 1914, c. 36) held not invalid for being vague and indefinite, because of use of words "orchard" and "locality."

5. **Courts ⬡366(1)—Federal court is bound by state court's interpretation of state statute.**

In passing on validity of state statute and rights of parties thereunder, federal District Court is bound by interpretation of highest court of state.

6. **Agriculture ⬡1—Provision for radius of destruction in one section of "Cedar Rust" Law held not to require similar radius in another section (Cedar Rust Law Va. 1914, §§ 1, 2).**

That "Cedar Rust" Law (Laws Va. 1914, c. 36) § 1, provided one mile radius from apple orchards for destruction of host plants for cedar rust held not to require that similar radius be read into section 2, which provided for two-mile radius within which host plants could be destroyed after investigation by entomologist.

7. **Agriculture ⬡1—Amendment of "Cedar Rust" Law, after adoption by county, held applicable, regardless of whether it was adopted by local authorities (Virginia Cedar Rust Law).**

Where "Cedar Rust" Law (Laws Va. 1914, c. 36), containing local option provision was adopted by certain county in 1916, amendment by state Legislature in 1920 (Laws 1920, c. 260), changing radius for destruction of host plants from one to two miles, is applicable, regardless of whether it was adopted by local authorities.

8. **Courts ⬡366(3)—Decision of state court construing statute, though not binding on federal court construing same statute because of different facts, is entitled to great respect (Laws Va. 1914, c. 36).**

In construction of "Cedar Rust" Law (Laws Va. 1914, c. 36) by federal court, to deter-

mine whether host plants within two-mile radius of orchard, but not one-mile radius, were affected, decision of state court construing such statute, in case where trees were within one-mile radius, though not binding on federal court, is entitled to great respect.

**9. Agriculture ⬤➡1—Statutory provisions for radius of destruction of host plants for cedar rust held not conflicting (Virginia Cedar Rust Law, §§ 1, 2).**

"Cedar Rust" Law (Laws Va. 1914, c. 36) § 1, declaring host plants for cedar rust within one mile of orchard public nuisance; *held* not in conflict with section 2, under which host plants within radius of two miles were to be destroyed only after state entomologist should have made investigation on request of 10 freeholders, and should have determined that they constituted menace to health of apple orchard in locality.

**10. Statutes ⬤➡190—Unambiguous statute must be given obvious meaning.**

When language of statute is plain and unambiguous, and conveys clear and definite meaning, there is no occasion for resorting to interpretation and construction, but it must be given plain and obvious meaning, even though court may think from extraneous circumstances that Legislature intended to enact something different.

**11. Statutes ⬤➡219—Contemporaneous construction of unambiguous "Cedar Rust" Law by state entomologist is without significance.**

Since language of "Cedar Rust" Law (Laws Va. 1914, c. 36) is plain and unambiguous, fact that state entomologist may have construed it as having different meaning is without significance, since it is only where statute is ambiguous that weight is given to contemporaneous construction by officials of executive department.

McDowell, District Judge, dissenting.

In Equity. Suit by Daniel Kelleher against G. T. French, State Entomologist of the State of Virginia. Injunction denied, and bill dismissed.

Randolph Harrison, of Lynchburg, Va., D. O. Dechert, of Harrisonburg, Va., and M. L. Walton, Jr., of Woodstock, Va. (Harrison, Long & Williams, of Lynchburg, Va., on the brief), for complainant.

John R. Saunders, Atty. Gen., of Virginia, F. S. Tavenner, of Woodstock, Va., and Geo. N. Conrad, of Harrisonburg, Va., for defendant.

Before PARKER and NORTHCOTT, Circuit Judges, and McDOWELL, District Judge.

PARKER, Circuit Judge. This suit was instituted to enjoin the state entomologist of Virginia from enforcing against complainant the provisions of the Virginia "Cedar Rust" Law. Laws 1914, c. 36. Complain-

ant applied for a preliminary injunction which was denied. Kelleher v. Schoene (D. C.) 14 F.(2d) 341. The case is now before us on final hearing. G. T. French, who has succeeded W. J. Schoene as state entomologist, has been substituted as party defendant, much testimony has been introduced, and all of the legal questions involved have been again argued.

Complainant, who is a citizen of the state of Washington, is the owner of a tract of land of 2,200 acres, known as the Mt. Airy estate, in Ashby magisterial district, Shenandoah county, Va. A valuable dwelling house is situate on the estate, and on the 20 acres surrounding it are a large number of cedar trees, which add greatly to the beauty of the place. On other parts of the land are a number of red cedars, which have some value as furnishing shade for cattle and providing posts for repair of fences. All of the cedars on the 20-acre tract and some of those on other parts of the estate are within a radius of two miles, but not within a radius of one mile, of large and valuable apple orchards, and constitute "host plants" for the disease known as "cedar rust" of the apple, described at length in the former opinion in this case. 14 F.(2d) 347 and 348.

The state entomologist has determined that these cedars constitute a menace to the health of apple orchards in the locality, and pursuant to the provisions of the Cedar Rust Law, set forth in full with all amendments in the former opinion, he has ordered that the trees on the 20-acre tract around the dwelling be treated each season by removing the cedar balls therefrom, and that the remainder of the cedar trees within the two-mile radius be cut down. It is to enjoin the entomologist from proceeding to enforce these orders that this suit has been instituted. Federal jurisdiction is based upon diversity of citizenship, as well as upon the allegation that the statute in question contravenes the Constitution of the United States. Although the amount recoverable as damages under the statute would be but a small sum, we think that the carrying out of the order of the entomologist would result in a loss to complainant exceeding $3,000, exclusive of interest and costs, and that consequently the case involves the jurisdictional amount.

Complainant contends (1) that the statute is void because it contravenes the due process and equal protection clauses of the Fourteenth Amendment to the federal Constitution; (2) that it is void because vague and indefinite; and (3) that, in so far as it is applicable to Ashby district, it authorizes

destruction of cedars only within a radius of one mile of an apple orchard, which does not embrace the cedars of complainant.

[1] We need not repeat nor elaborate what was said in our former opinion as to the constitutionality of the statute. On the final hearing much evidence was introduced as to the nature of the cedar rust disease and its destructive effect upon the apple-growing industry. In the light of that evidence we have no doubt that the enactment of the statute was a valid exercise of the police power of the state. Properly considered, it does not authorize the taking of one man's property for another man's benefit, but is a reasonable regulation of the use of property in furtherance of the public welfare. It authorizes the destruction of trees, which are shown to be of but comparatively little value, only where they constitute a menace to a great industry of the state.

[2] The state cannot, of course, take one man's property for the benefit of others; but it can say that in the enjoyment of property the owner shall not use it in such way as to endanger the rights and property of others. It is quite apparent, from the evidence in this case, that one who allows infected cedars to grow upon his land in an apple-growing community is maintaining that which is a constant menace to the business of the community. He no more has the right to use his land in growing such trees than he has to use it as a place for keeping animals afflicted with contagious diseases, or for storing dangerous explosives, or for maintaining a business which endangers the safety, morals, health, or general welfare of the community. A full discussion of the authorities bearing upon this question is contained in Bowman v. State Entomologist, 128 Va. 351, 105 S. E. 141, 12 A. L. R. 1121, and note, Miller v. State Entomologist, 146 Va. 175, 135 S. E. 813, and the former opinion in this case, 14 F. (2d) 341.

[3] Complainant places great reliance upon the decision of the Supreme Court in Eubank v. Richmond, 226 U. S. 137, 32 S. Ct. 76, 57 L. Ed. 156, 42 L. R. A. (N. S.) 1123, Ann. Cas. 1914B, 192, contending that the statute here denies due process and equal protection because under section 2 it provides that the state entomologist shall make inquiry to ascertain the existence of the disease upon the request in writing of ten freeholders. We think, however, that there is a wide difference between the case of Eubank v. Richmond and the case at bar. In that case the Supreme Court held invalid a city ordinance, which required the committee on streets of the city to establish a building line upon the request of the owners of two-thirds of the property abutting on any street and forbade the erection of any building except within the limits thus fixed. In holding the ordinance invalid, the court said:

"It leaves no discretion in the committee on streets as to whether the street line shall or shall not be established in a given case. The action of the committee is determined by two-thirds of the property owners. In other words, part of the property owners fronting on the block determine the extent of use that other owners shall make of their lots, and against the restriction they are impotent. This we emphasize. One set of owners determine not only the extent of use, but the kind of use, which another set of owners may make of their property. In what way is the public safety, convenience or welfare served by conferring such power? The statute and ordinance, while conferring the power on some property holders to virtually control and dispose of the proper rights of others, creates no standard by which the power thus given is to be exercised; in other words, the property holders who desire and have the authority to establish the line may do so solely for their own interest or even capriciously."

It is manifest that the principle decided in that case has no application to the case at bar. The only similarity between the two cases is that in each the statute provides for action by public authorities upon request of property owners. In the Eubank Case, however, the request of the property owners was mandatory, and the action by the public authorities merely carried out their will. Here the request of the freeholders merely imposes upon the state entomologist the duty of making inquiry and does not control his action. The destruction of cedar trees is authorized only upon his finding that they are the host plant of the cedar rust disease and constitute a menace to apple orchards in the locality. Upon such finding the destruction of the trees is authorized on the ground that they constitute a public nuisance; and the evident purpose of the statute in requiring a request from 10 freeholders before the entomologist is required to make an investigation is to insure that a considerable portion of the public are affected by the nuisance before setting in motion the machinery for investigating and abating it as such. In this respect the procedure is analogous to that prescribed by section 1520 of the Code of Virginia relating to public nuisances, which provides that upon complaint of 5 or more

citizens of a county that a public nuisance exists therein a special grand jury shall be summoned to investigate the complaint, and if found to exist to institute proceedings looking to its abatement. Miller v. Entomologist, 146 Va. 184, 135 S. E. 813.

[4] The next point is that the statute is invalid because of vagueness and indefiniteness. This contention is based upon the use of the words "orchard" and "locality," and may be disposed of in a few words. The word "orchard" has always had a well-understood meaning, and the use of such a term in a statute could not possibly render the statute void for vagueness. Whether the word as used embraces groups of fruit trees not used for commercial purposes, and having but small value, it is not necessary to decide in this case. There can be no doubt that it embraces such a large commercial orchard as the "Turkey Knob orchard," which lies within two miles of the Kelleher cedars. Nor is there any vagueness in the use of "locality" in the statute, as that word is interpreted by the Supreme Court of Appeals of Virginia in the Miller Case, 146 Va. at 185 and 186. That this court in the former opinion, before the decision in the Miller Case, may have placed a slightly different interpretation upon the word is wholly immaterial.

[5] It is too well settled to admit of argument, or justify the citation of authority, that in passing upon the validity of the statute or the rights of the parties thereunder, we are bound by the interpretation of the highest court of the state. The same may be said as to the contention that only such individual cedars are subject to destruction as are shown to be infected by the cedar rust disease, although other cedars near at hand may be shown to be infected. The answer is that the highest court of the state has construed the statute otherwise. Miller v. State Entomologist, 146 Va. at 190, 191, 135 S. E. 813; Bowman v. State Entomologist, 126 Va. 357, 369, 370, 105 S. E. 141, 12 A. L. R. 1121.

[6, 7] The only remaining question in the case, and one which has occasioned us some difficulty, is whether the statute as in force in Ashby district authorizes the destruction of infected cedars within a radius of two miles of an apple orchard, or whether such destruction is authorized only within a radius of one mile. If the latter interpretation is correct, complainant is entitled to relief, as none of his cedars are within the one-mile radius. An examination of the statute, which with the amendments is set forth in the former opinion, will show that, when it was enacted in 1914, section 1 provided that it should be unlawful for any person to keep alive and standing upon his premises any red cedar tree or trees which are, or may be, the source, harbor, or host plant of the cedar rust disease within a radius of *one* mile of any apple orchard, and such cedar trees were declared public nuisances, and it was made the duty of the owner to destroy them when directed to do so by the state entomologist. The second section made it the duty of the state entomologist to make an investigation, upon the request of ten freeholders, to ascertain if there were such infected cedars within a radius of *two* miles of any apple orchard which constituted a menace to the health of any apple orchard in the locality, and, upon a finding that such was the case, to notify the owner or owners to destroy them. Subsequent sections contained a local option provision under which the statute might be adopted for counties or magisterial districts by action of the local authorities. Under this provision it was adopted for Ashby district in the year 1916. The statute was amended in 1920 (Laws 1920, c. 260) by striking out the word "one" in the first section and substituting "two," so that it was made unlawful to keep infected cedars alive and standing within a radius of two miles of an apple orchard, and such cedars were declared a public nuisance within that radius.

The contention of complainant is that the statute as originally enacted must be construed as authorizing destruction of cedars only within the one-mile radius, and that the amendment of 1920 did not change the act so far as it affected the Ashby district, for which it had been adopted under the local option provision prior to the amendment. We have given careful consideration to this contention, but we do not think that either of the propositions upon which it rests is sound. In the first place, although it is true that the first section of the act prescribes a one-mile radius, the action of the entomologist was taken under the second section, which prescribes a two-mile radius, and we do not think that a proper interpretation of the act requires that we read "one," instead of "two," in the second section. In the second place, even if the act be construed as prescribing a one-mile radius in both sections, we think that unquestionably the amendment of 1920 has extended the radius to two miles wherever the act is applicable, whether adopted by the local authorities before or after the amendment.

In our former opinion, we were under the

impression that the use of "one," instead of "two," in the first section of the act, was a clerical error, which, however, we passed by as unimportant, on the ground that the action of the entomologist was taken under the second section. It seems that we were mistaken in assuming that there was a clerical error in the first section. From the legislative records introduced on the final hearing before us it appears that, as a matter of fact, the word "one" was substituted for "two" in that section by an amendment introduced on the passage of the act. But, because we have found that there was no error in the first section, it does not follow that there was error in the second section. There is nothing inconsistent between the two sections, and there is nothing in the act itself or in the history of its passage, which would justify us in ignoring the clear and unambiguous language of the second section. As was said by the Supreme Court of Appeals of Virginia in dealing with the same point in Miller v. Entomologist, 146 Va. 175, 187, 188, 135 S. E. 813, 817:

"Why one mile should have been inserted in the first section of the act (Code, § 885) and two miles in the second section (Code, § 886) is a mere matter of conjecture, with which, in our view of the case, it is unnecessary for us to deal. The subject is discussed in Kelleher v. Schoene, supra. It may be observed, however, in passing, that the first section (Code, § 885) appears to be a mere declaration of public policy, declaring the infected cedars within one mile to be per se a public nuisance, and might have been omitted, without impairing the completeness and efficiency of the residue of the act."

[8] It is suggested that we are not bound by the decision in Miller v. Entomologist on this point because in that case the trees were within the one-mile radius. This is true, but, nevertheless, what is said in that case is entitled to great respect, being an expression by the highest court of the state of Virginia as to the meaning of a statute of that state. Moreover, it is in complete harmony with what we said in our former opinion (14 F. [2d] 346) as follows:

"The first section of the statute is unimportant. If the Legislature had the power to order the destruction of any cedar trees, a declaration by the Legislature that such trees constitute a nuisance could add nothing to its power and could not otherwise be of importance. On the other hand, the second section is of the utmost importance. In it the limits

of the entomologist's duty and the limits of his power are stated."

[9] As stated above, there is no conflict between sections 1 and 2 of the act as originally passed. Under both sections red cedar trees, which were or might be the host plant of the cedar rust disease, were to be destroyed upon the order of the state entomologist; but in the first section such cedar trees within or e mile of an orchard were declared a public nuisance, and it was made unlawful for a landowner to allow them to stand upon his premises, whereas, under the second section, trees within a radius of two miles were required to be destroyed only after the state entomologist should have made an investigation upon the request of 10 freeholders, and should have determined that they constituted a menace to the health of an apple orchard in the locality. The difference between a section which declares infected cedars per se a nuisance, and their maintenance unlawful, and one which authorizes their destruction upon a finding by a state official that they constitute a menace to apple orchards in the locality, is obvious. It may have been that the Legislature thought that cedar trees, which were the host plants of the cedar rust disease, were so clearly a menace to apple orchards within a radius of one mile as to warrant their being declared public nuisances without further inquiry; whereas, in cases where the orchards were at a greater distance, circumstances such as the topography of the country, the direction of air currents, etc., might render them comparatively harmless, and that in such cases there should be a finding by the entomologist that they actually constituted a menace before their owner should be placed in the attitude of maintaining a public nuisance by permitting them to stand.

It is not necessary, however, to inquire as to what motives actuated the Legislature in prescribing a one-mile radius in the first section of the act. We are dealing with the second section, and the language of that section is clear and unambiguous, and the first section conflicts with it in no respect whatever. For us to assume that, because the Legislature changed the radius prescribed by the first section from two miles to one mile, it intended to change the radius of the second section also, would be to indulge in a mere guess, unsupported by the language or the history of the act, and completely at variance with the plain meaning of the language used. We think that it is more reasonable, as well as more respectful to the

lawmaking body of the state, to assume that, if it had intended to amend the second section at the time it amended the first section, it would have done so. The fact that the Legislature has allowed the second section to remain unamended for over 13 years is certainly some ground for believing that in the language of that section it expressed the exact meaning which it intended.

[10] It is well settled that, when the language of a statute is plain and unambiguous, and conveys a clear and definite meaning, there is no occasion for resorting to interpretation and construction. The statute must be given its plain and obvious meaning. 25 R. C. L. 962; Com'r of Immigration v. Gottlieb, 265 U. S. 310, 44 S. Ct. 528, 68 L. Ed. 1031; U. S. v. Atchison, etc., R. Co., 249 U. S. 451, 39 S. Ct. 325, 63 L. Ed. 703; Adams Exp. Co. v. Com. of Kentucky, 238 U. S. 190, 199, 35 S. Ct. 824, 59 L. Ed. 1267, Ann. Cas. 1915D, 1167; U. S. v. First Nat. Bk. of Detroit, 234 U. S. 245, 34 S. Ct. 846, 58 L. Ed. 1298; Thornley v. U. S., 113 U. S. 310, 5 S. Ct. 491, 28 L. Ed. 999. And this rule is adhered to, even though the court may think from extraneous circumstances that the Legislature intended to enact something different from what it did enact. 25 R. C. L. 962; Pittsburgh, etc., R. Co. v. Naylor, 73 Ohio St. 115, 76 N. E. 505, 3 L. R. A. (N. S.) 473, 112 Am. St. Rep. 701; Woodbury v. Berry, 18 Ohio St. 456. "It is only where the true meaning of the language used in a statute is doubtful, or so obscure that the meaning of the Legislature cannot be determined by giving the words used their ordinary and natural signification, that resort can be had to the journals or other extraneous sources of information for aid in arriving at the true meaning of the language used in the statute." Shenandoah Lime Co. et al. v. Governor of Virginia et al., 115 Va. 865, 80 S. E. 753, Ann. Cas. 1915C, 973.

[11] And, the language of the statute being plain and unambiguous, the fact that the state entomologist may have construed it as authorizing destruction of trees within a radius of only one mile of an orchard is without significance. It is only where the statute is ambiguous that weight is given to contemporaneous construction by officials of the executive department. Houghton v. Payne, 194 U. S. 88, 24 S. Ct. 590, 48 L. Ed. 888; U. S. v. Finnell, 185 U. S. 236, 22 S. Ct. 633, 46 L. Ed. 890; St. Paul, etc., R. Co. v. Phelps, 137 U. S. 528, 11 S. Ct. 168, 34 L. Ed. 767; U. S. v. Graham, 110 U. S. 219, 3 S. Ct. 582, 28 L. Ed. 126.

But, even if the statute as originally enacted be construed as authorizing the destruction of cedar trees only within a radius of one mile of apple orchards menaced by them, there can be no doubt that the amendment of 1920 extended the radius to two miles. As said by Judge McDowell in the former opinion (14 F. [2d] 346):

"If the original statute had in both the first and second sections mentioned only a radius of one mile, and had otherwise been expressed as it was expressed, we can think of no constitutional provision which would make invalid an amendment making the radius two miles and expressly providing that the amendment should apply in districts which had previously adopted the original statute, without further action by the county authorities. The legislative act of grace, in making the application of the original act optional, could by no possibility, in and of itself, destroy the legislative power to thereafter make laws without regard to the wishes of county authorities. And this power necessarily includes the power to amend existing laws, also without regard to the wishes of county authorities."

Assuming that the act of 1914 prescribed only a one-mile radius, no one will question, we think, the power of the Legislature to extend the radius to two miles within the counties and districts which had adopted it with a one-mile provision. The only question, then, is one of interpretation, viz.: Did the Legislature, when amending the act, intend that it should not apply as amended in the districts which had previously adopted it, without further adoption on their part; or did it intend to amend the act so that, wherever it was in force, it should be in force as amended? We think that the latter is unquestionably the correct interpretation. The statute as originally enacted, upon its adoption by the various counties and districts, became the law in those which adopted it. When the Legislature amended the statute, it changed that law. It did not leave the old law in existence unaffected by the amendment, as it might have done, and pass a new law for such counties and districts as might thereafter adopt it. It amended the only law which was in existence on the subject, and, as that had become by adoption the law of certain districts, it thereby amended the law of those districts.

In the case of Miller v. State Entomologist, supra, the contention was made that as a result of the amendment the original statute was repealed in those districts which had adopted it, but this view was rejected; the court saying:

"In the instant case, as above stated, the only change made was the substitution of the word 'two' for the word 'one' in section 885 of the Code. The remaining sections on the subject were left unchanged. This did not in any way affect or change what had already been done under the original act, but simply extended the area within which thereafter infected cedars should be deemed, per se, a public nuisance. There is no intimation of any other intention."

If complainant's interpretation of the original statute be correct, and if, as held by the Supreme Court of Appeals, the amendment did not effect a repeal of the statute in the districts for which it had previously been adopted, it follows that the amendment extended the radius within those districts to two miles. The only other interpretation supposable is that the amendment left the law prescribing a one-mile limit in effect in such districts and prescribed the two-mile limit only for districts subsequently adopting the law. This interpretation, however, could not possibly be correct, for the reason that the radius prescribed by the original act was *changed* to two miles, and no law was left upon the statute books prescribing a one-mile radius.

The conclusion that the act as amended should be interpreted as extending the one-mile radius to two miles without further adoption by the local authorities is, we think, not only in accord with reason but also with well-settled rules of interpretation. The rule is well stated in Endlich on Statutes, § 294, quoted with approval by the Supreme Court in Blair v. Chicago, 201 U. S. 400, 475, 26 S. Ct. 427, 446, 50 L. Ed. 801, as follows:

"A statute which is amended is thereafter, and as to all acts subsequently done, to be construed as if the amendment had always been there, and the amendment itself so thoroughly becomes a part of the original statute, that it must be construed, in view of the original statute, as it stands after the amendments are introduced and the matters superseded by the amendments eliminated."

See, also, Black on Interpretation of Laws, p. 357; Stonega Coke & Coal Co. v. Southern Steel Co., 123 Tenn. 428, 131 S. W. 988, 31 L. R. A. (N. S.) 278, 283; University of Utah v. Richards, 20 Utah, 457, 59 P. 96, 77 Am. St. Rep. 928, 932; 25 R. C. L. 907.

The use of the words "as to all acts subsequently done" in the rule quoted from Endlich does not, of course, mean that the ordinary rule of interpretation is to be departed from in the case of statutes subject to local option provisions, but merely that the statute as amended should not be construed so as to give a retroactive effect to the amendment. It is a common practice for state Legislatures to pass general laws as to local matters, and as in the case at bar, to provide that they shall become the law in the various localities upon adoption by local authorities. It would be productive of the greatest confusion and inconvenience for the courts to adopt as a rule of interpretation that amendments to such general laws are not to be construed as applicable in the localities where such laws have been adopted prior to amendment. The Legislature has the power to pass a local law without submitting it to the approval of the local authorities. The fact that it does submit it to their approval, and makes its operation in the locality conditional thereon, does not, of course, impair the power of subsequent amendment, or require the application of any new or additional rules of interpretation in construing amendments thereto.

Defendant has urged certain matters of procedure as reasons for denying the injunction and dismissing the bill. The points presented are interesting, but we need not pass upon them. For the reasons stated, we think that the statute is valid and constitutional, that it authorizes the destruction of cedar trees within a two-mile radius of an apple orchard upon a proper finding by the entomologist, and that the action of the entomologist in this case was justified by the facts shown in evidence. It follows that complainant is not entitled to the injunction prayed, and that the bill should be dismissed.

Injunction denied, and bill dismissed.

McDOWELL, District Judge (dissenting). As has been pointed out in the majority opinion, all of the cedar trees here in litigation are more than one mile and less than two miles from any apple orchard. At the final hearing of this case a totally new and unexpected fact was proved. As originally introduced in the House of Delegates, the cedar rust bill provided in both the first and second sections for a limit of two miles, and on the second reading of the bill an amendment changing the first section so as to read one mile was adopted. No change was made in section 2. A difference of opinion as to the weight properly to be given to this evidence is, I believe, the chief reason for the differing constructions put on the Cedar Rust Law by the majority and by myself. In the majority opinion this evidence is treated as of slight importance. To

me it seems of so much importance as to require an abandonment of the conclusion reached in the former opinion of this court in this case. See Kelleher v. Schoene, 14 F.(2d) 341.

1. *The Intent of the Original Statute.*— As of course the limit of one mile in section 1 was, as we now know, intentional. I am unable to read the section as showing an intent to subject cedar trees growing within one mile of an orchard, or the owners of such trees, to the fate denounced by the common law of nuisances or by the general statute law in regard to public nuisances. Code 1919, § 1520 et seq. The sufficient reason for this conclusion is found in the language of section 1. This section concludes: "* * * And it shall be the duty of the owner or owners of any such cedar trees to destroy the same as soon as they are *directed to do so by the state entomologist, as hereinafter provided.*" These words seem to me to forbid an intent that private persons, specially injured, should have a right to destroy cedar trees within a mile of an orchard, or that owners of such trees should be subject to indictment and a fine of not exceeding $5,000 for maintaining a nuisance.

In section 1, immediately following the words, "are hereby declared a public nuisance," are the words, "and shall *be destroyed as hereinafter provided.*" These words do not at all comport with an intent that a recalcitrant owner of condemned cedar trees shall be subject to a suit for damages, or to any other consequence of maintaining a public nuisance. The only result (see Code 1918, § 889; 14 F.[2d] 342) is that *the entomologist* shall cause the trees to be destroyed.

In the light of the new evidence, section 1, with great deference, seems to me to be a prefatory explanation of the reason for enacting the statute, rather than a declaration of public policy. The nature of cedar rust as understood in 1914 was such that only cedar trees growing within some rather short distance from the nearest apple orchard were regarded as dangerous. See evidence of Dr. M. B. Waite (transcript, p. 233). Hence the very essence of section 1 was to say in effect: "Whereas, some red cedar trees growing within [*some specified distance*] from the nearest apple orchard are considered a public danger, in the nature of a public nuisance: Now, therefore, be it enacted," etc.

It follows, from the nature of section 1, that it had to contain a precise statement of the minimum distance from any apple orchard at which the public safety permitted cedar trees, which are or may be the hosts of cedar rust, to grow. As such was the nature of section 1, the change from the minimum of two miles, as the section was originally drawn, to one mile, not only shows that the Legislature thought a minimum of one mile to be sufficient, but that the limit of the operation of the statute was also intended to be stated. Whether this section be called a declaration of public policy or not, the limit stated in it is, in view of the amendment made in 1914, of high importance.

If section 1 was intended as a declaration of public policy, this fact seems to me to forbid us to construe the statute of 1914 as intended to affect cedar trees growing more than one mile from an orchard; for, if we so construe the statute, we convict the Legislature of 1914 of an intent to contravene its own declaration of public policy.

In Miller v. State Entomologist, 146 Va. 175, 187–188, 135 S. E. 813, 817, it is said: "It may be observed, * * * in passing, that the first section * * * appears to be a mere declaration of public policy, declaring the infected cedars within one mile to be per se a public nuisance, and *might have been omitted, without impairing the completeness and efficiency of the residue of the act.*"

If the foregoing statement was made without knowledge of the fact that the first section of the original bill had been changed in the House from two miles to one mile, it seems to me impossible to give to it even such weight as would ordinarily be due from this court to a dictum by the Virginia Supreme Court of Appeals concerning the nature of a Virginia statute. The record in the Miller Case shows that there was in the evidence no suggestion of the way in which the discrepancy between the first and second sections came about.

The purpose of an explanatory preface to a statute—usually commencing with the word "whereas"—is to show the reason for the enactment of the statute. Such clauses could usually, perhaps always, be omitted without impairing the efficiency of the residue of the statute. But when not omitted, and when known to be free from unintentional error, the explanation of the reason for enacting a statute can throw much light on the intent of the remainder of the statute.

That there is a conflict between the first two sections of the statute seems to me, with deference, an unavoidable conclusion. Section 1 makes it the duty of the owners, if so ordered by the entomologist, to destroy cedar trees within one mile of any apple or-

chard. Section 2 makes it the duty of the owners, if so ordered by the entomologist, to destroy cedar trees within two miles of any apple orchard. At the risk of tiresome repetition, I quote here from the closing lines of each of the two sections:

Section 1: " * * * It shall be the duty of the owner or owners of any such cedar trees to destroy the same as soon as they are directed to do so by the state entomologist, as hereinafter provided."

Section 2: " * * * And the owner or owners shall within such time as may be prescribed in such notice by the state entomologist cut down and destroy said cedar trees."

A recital that the public good requires the destruction of condemned cedar trees within one mile of any apple orchard, and an ordinance that such trees within two miles of any orchard, shall be destroyed, can, to my mind, be regarded only as in conflict. As there is a conflict between the first two sections of the statute, the intent of the lawmakers should I believe be considered on the assumption that this conflict was not perceived.

The words "one mile" were introduced into section 1 by amendment made on the second reading of the bill in the House. Hence the fact that section 1 as amended contained a limit of one mile was known to the members of the House at least. And, if the conflict was not perceived, the members of the House were inadvertent to the fact that the limit in section 2 was two miles. Such being the fact, the majority of the members of the House, if they had any rational purpose in amending section 1, so as to read "one mile," intended, as it seems to me, to limit the operation of the statute to one mile. I cannot assume obliviousness of the fact that section 2 contained a limit of two miles, and also ascribe any rational purpose in reducing the limit in section 1, except that of reducing the radius of operation of the statute.

I labor under the belief that, in construing statutes, courts do not consider the intent of a single member, who offers an amendment. The intent of a single individual is too nearly impossible of ascertainment. But the intent of a large number, a majority of either house of a Legislature, is capable of being ascertained with some reasonable degree of accuracy. What motive actuated the member of the House who offered the amendment of section 1 I therefore leave out of view. But if the majority (at least) of the members of the House who voted for the change in section 1 were unmindful of the two-mile limit in section 2, I can ascribe to them no permissible purpose, except that of limiting the operation of the statute.

If the majority of the Senators did not know of the conflict between the two sections, we can never know what their intention actually was, and must indulge the most probable assumption, which is that the Senate had the same intent as the House.

While it is possible that the conflict between section 1 after amendment and section 2 was noticed, this assumption seems to me quite improbable. That a body of honest and reasonable men, such as a legislative majority, would have enacted a law knowing it to contain provisions in such conflict as to create grave doubt as to the intent of the lawmakers in a very important respect, seems to me very unlikely.

Even if the legislators regarded section 1 as a useless and entirely unimportant declaration, and if we must assume that they amended a useless section, knowing it to be such, still it seems to me quite improbable that they would have knowingly left the statute so that the explanatory section embraced only a small portion of the trees which were in the next section made subject to condemnation and compulsory destruction. As I look at it, the assumption that the conflict was not perceived seems so much more probable than the assumption that the conflict was perceived that it may be supererogatory to discuss the latter assumption.

However, it should be here said that the evidence showing that the language of section 1 was due to amendment seems to me to make it probable that the legislators did not regard section 1 as useless, or even as unimportant. Aside from the mere fact that it was amended, another reason for this conclusion is as follows: The Cedar Rust Law of 1914 was novel legislation in this state, and its constitutionality was probably somewhat doubted. A belief that an exercise of the police power which would result in the destruction of private property of some value, and which would directly benefit the private owners of apple orchards, had to be prefaced by a declaration showing that the public good was the chief purpose of the statute was from a layman's point of view not unreasonable; or it may have been believed that it was beyond the power of the Legislature to authorize the destruction of private property without a precedent declaration that such property *constituted a nuisance*. And, if either belief existed, it seems probable that the members

of the Legislature looked upon section 1 as being the most important section in the entire statute. And if the lawmakers did so regard section 1, it could reasonably have seemed to them that an amendment reducing the limit in that section made it wholly unnecessary to also correspondingly reduce the limit in section 2. In other words, even if we indulge the assumption that the legislators perceived the conflict, still the probable intent was to reduce the limit of effectiveness of the statute to one mile.

There is one possibility that I have not mentioned: That the first section was regarded by the lawmakers as unimportant, and that the conflict between section 1 as amended and section 2 was recognized. This possibility is, I think, not a permissible hypothesis. No matter how unimportant section 1, standing alone, may have been thought, the conflict between the distances mentioned in the two sections—both being intentional—necessarily threw doubt upon a highly important point in the law, which was the radius intended to be affected by the law. The majority of a Legislature must be presumed to have been reasonably intelligent, and, being so, they cannot reasonably be supposed to have intended to enact a law of most doubtful meaning in respect to a highly important point.

Moreover, on the final hearing the plaintiff also for the first time introduced evidence, which was not denied, showing that the state entomologist, until after the amendment of 1920 had been adopted, always construed the statute as applying only to cedar trees within one mile of an orchard. And in the opinion in Bowman v. State Entomologist, 128 Va. 351, 380, 105 S. E. 141, it is said that the counsel had agreed that the limit of two miles in section 2 of the statute was a typographical error. This was, as we now know, a mistaken explanation; but it tends to support the belief that the original statute was generally thought to apply only to cedar trees within one mile of an orchard. It seems to me therefore that the statute which was adopted for Ashby district in 1916 was intended to be, and hence was, a one-mile law. Whether or not the county authorities then adopted the law subject to the amendment of 1920 depends, not on the intention of the county authorities in 1916, or subsequently, but on the intention of the Legislature in 1920.

2. *The Intent of the Amendment of 1920.* —The amendment of 1920 merely made section 1 of the statute read "two miles," where it had read "one mile." The local option provision, as it was expressed in the original statute, was left untouched. See 14 F.(2d) 343, § 893. The evidence as to the situation at the time the amendment of 1920 was adopted is very meager. On the cross-examination of W. J. Schoene (transcript, 567) it was shown that some or all of the magisterial districts in some 11 counties had, prior to January 11, 1926, adopted the Cedar Rust Law. But the dates of adoption are not stated. From the evidence of W. W. Glass (transcript, 526) it may be fairly inferred that the law was adopted in his district of Clarke county prior to the amendment of 1920. It is, as has been said, an undisputed fact that in Ashby district of Shenandoah county the original statute was adopted in 1916. There were in 1920 100 counties in Virginia. Acts 1920, pp. 861–863. And it is a matter of common knowledge that there are red cedar trees growing within two miles of an orchard throughout many large areas of the state, containing numerous magisterial districts, which had not adopted the Cedar Rust Law as late as January 11, 1926. The great majority of these orchards are domestic orchards, but the statute embraces domestic orchards. In addition, in three of the Valley of Virginia counties (Warren, Page and Rockbridge) no magisterial district had, even in 1926, adopted the law. And it is shown by the evidence (transcript, 570) that one magisterial district in Clarke county adopted the law after January 1, 1926. There was therefore in 1920 reasonable ground to expect that in some, perhaps in many, magisterial districts, the adoption of the law would thereafter be proposed.

The intention that the county officials, acting for the people of such districts, should have a right to adopt or reject the law as amended in 1920, is unquestionable. Leaving in force section 893 shows, as it seems to me, such purpose beyond doubt. That the intention was to deny this privilege to the people of the districts, which had before the enactment of the amendment of 1920 adopted the one-mile law, and to give this privilege to the people of all the districts which had not previously adopted the law seems to me quite improbable. Nothing is more studiously avoided by American legislative bodies than unfairness to considerable numbers of citizens. An intention to treat the citizens of the magisterial districts which had previously adopted the one-mile law with the slightest degree of unfairness is almost unbelievable. It follows that we need not consider the equal protection clause of the Fourteenth Amendment. An intent to be unfair, or a

failure to perceive unfairness, are too highly improbable to need further comment.

If the original statute had been intended to be effective for two miles, the change from one mile to two miles in the first section, and the retention of the local option provision, would not have indicated an intention that the law must be again adopted in those districts which had previously adopted it. Such districts would have been in 1920 in the position of having adopted a law that was intended to be (and which therefore was) operative for two miles; and the retention of the local option feature could have been intended merely to give to other districts the same option that had already been exercised by the districts which had previously adopted the law.

However, if the original statute was intended to be effective for only one mile, the retention of the local option provision in 1920 has, I think, necessarily a different meaning. In 1920 a new law was being enacted, a law that was to be effective for twice the radius of the old law. While the retention of the local option provision necessarily shows that that provision was intended to apply to districts which had not previously adopted the original act, there is nothing in the statute tending to show that that provision was not also intended to apply to the districts which had previously adopted the old law. Adoption by a district of a law effective for one mile does not at all show willingness to adopt a law effective for two miles. And the failure of the lawmakers in 1920 to express or in some way to indicate an intention to restrict the operation of the local option provision forbids that we should read into the statute a clause excepting from the operation of section 893 the districts which had previously adopted the old one-mile statute. If there was an intention to so restrict the local option provision, we have a plain casus omissus, and the courts cannot supply the words that are indispensably necessary to indicate such intent.

Again, in Fullerton v. Northern Pacific R. Co., 266 U. S. 435, 437, 45 S. Ct. 143, 144 (69 L. Ed. 367) it is said: "'It is a rule of construction, that all statutes are to be considered prospective, unless the language is express to the contrary, or there is * * * necessary implication to that effect.' Harvey v. Tyler, 2 Wall. 328, 347 [17 L. Ed. 871]; Sohn v. Waterson, 17 Wall. 596, 599 [21 L. Ed. 737]; Twenty Per Cent. Cases, 20 Wall. 179, 187 [22 L. Ed. 339]; Chew Heong v. United States, 112 U. S. 536, 559 [5 S. Ct. 255, 28 L. Ed. 770]; Shwab v. Doyle, 258 U. S. 529, 534 [42 S. Ct. 391, 66 L. Ed. 747, 26 A. L. R. 1454]. And see Hopkins v. Lincoln Trust Co., 233 N. Y. 213 [135 N. E. 267]."

It may be said that to read the amended statute as denying to the districts which had adopted the original statute an optionary right to adopt or reject the new law would not be giving the amendment a retroactive effect, but would merely be giving an unexpected effect to the prior adoption. I think this is a distinction without practical difference. The principle of the rule against retroactive construction is as fully applicable here as in any case. Unless that which is in effect a retroactive operation be read into the amendment, the districts which had adopted the original law will necessarily be given the benefit of the local option provision, which is general in its terms. Nothing in the amendment, expressly or by implication, requires that the statute be construed retroactively, either strictly or in effect; and the rule against retroactive construction affords strong reason for holding that the amended statute has never been in force in Ashby district.

The adoption of the original statute in Ashby district in 1916 remains in force as to cedar trees within one mile of an orchard (Miller v. State Entomologist, supra, 146 Va. 175, 135 S. E. 813); but until the new law shall have been adopted in that district the cedar trees in litigation are as I see it not within the statute.