[Civ. No. 1298. Fourth Appellate District.—March 9, 1934.]

F. R. KELLOGG et al., Plaintiffs and Appellants, v. M. D. HUFFMAN et al., Defendants and Respondents; WILLIAM A. SHEARER et al., Interveners and Appellants.

Pace, Smith & Purdue, Troy Pace and Russell & Heid for Appellants.

Chandler, Wright & Ward, Lawler & Degnan, Everts, Ewing, Wild & Everts, Gallaher & Ozias, George H. Woodruff, P. E. Keeler and C. H. Hartke for Respondents.

BARNARD, P. J.—This is an action to quiet title to 160 acres of land in Kettleman Hills in Fresno County. The land in question was owned in 1914 by the British Californian Oil Company, Ltd., a California corporation. This corporation owned several properties located near Los Angeles, and also this piece of land in Fresno County which was then regarded as of little value. This property was rough and arid and was situated in what was, until about 1929, a sparsely settled country used only for grazing purposes.

In April or May, 1914, one of the plaintiffs, J. Foster Kell, a resident of London, representing about 450,000 shares of stock in this corporation, came to California for the purpose of attempting to wind up the affairs of the company and to get what he could for the English stockholders. He was elected to the board of directors and succeeded in selling all of the properties owned by the corporation with the exception of this piece of land. After all the other properties had been sold, and under date of June 3, 1914, the corporation executed and delivered a grant deed conveying this property to him. This deed recites that it was given in pursuance of a resolution passed by the board of directors, and sets forth a copy of the resolution which contains a recital to the effect that the bid of J. Foster Kell of $10 for the land had been accepted, and goes on to authorize the execution of a deed in his favor. This deed was acknowledged, and was recorded on June 13, 1914. Under the same date as the deed, June 3, 1914, J. Foster Kell executed an instrument which recited that this land had been conveyed to him and that he held the same upon the following trusts: 1. That he would pay the taxes on the land until the same was sold. 2. That at any time within ten years, upon request, he would convey the land to any person named by the other directors at a price fixed by them. 3. That from the proceeds of the sale he would deduct the amounts paid by him for taxes, a reasonable fee for his services, and pay the balance to the stockholders of the corporation in proportion to their holdings or

as mutually agreed by the directors. 4. That if a sale was not effected within ten years, he would continue to act as trustee on the same terms or convey the land to such person as should be agreed upon by the directors. 5. That in the event of his death, the record of this declaration of trust should operate as a conveyance of the land to the other directors or their survivors, who should then hold the land in trust in like manner. This instrument was not recorded until February 5, 1931, after this action was commenced. Until about the time this action was filed none of the defendants had any information or notice, express or implied, that any such instrument had been executed or that any of the plaintiffs or interveners claimed any interest in the property.

This land was assessed for taxes in 1914 at $240 and was sold to the state on June 23, 1915, for $6.55. On June 28, 1920, it was sold at a tax sale for $650 to the defendant M. D. Huffman, who thereafter conveyed a one-quarter interest therein to the defendant Hardie. A correction deed was executed by the tax collector to the defendant Huffman on September 22, 1930, and another correction deed on October 2, 1930. All of these deeds were recorded. When the tax deed was issued in 1920, the defendant Huffman redeemed the land from all unpaid taxes and, thereafter, the defendants paid all taxes assessed from year to year, to and including the year 1931. Shortly after receiving the tax deed, the defendant Huffman went to the land for the purpose of taking possession. He found that two brothers, Ed Bourdieu and Jean Bourdieu, who lived near the land, had been pasturing their sheep upon the same. He informed them that he had bought the land, wanted to locate and take possession of it and, at his request, one of the brothers went to the land with him and pointed out to him the boundaries thereof. After walking over the land and locating its boundaries, the defendant Huffman agreed to lease the land to the two Bourdieus for sheep grazing for $20 a year. On a similar arrangement, year by year, these parties leased the land from the defendants and grazed sheep upon it during all of the time that feed was available, and during all of the time the same could be used for pasturage purposes, each year thereafter up to and including the year 1929.

On December 2, 1925, the plaintiff Shearer wrote to the tax collector of Fresno County inquiring whether the taxes on the land had been paid. In reply he received a letter dated December 5, 1925, inclosing a tax statement and informing him that a portion of the taxes for the current year had been paid. On December 7, 1925, he wrote to the county recorder asking for a record of the property involved, stating that he was one of the holders of a deed of trust, and asking what transfers had been made since the recording of a deed of trust dated June 3, 1914. He received from the county recorder a reply dated December 9, 1925, listing the deed from the British Californian Oil Company, Ltd., to J. Foster Kell, tax sales for the years 1914 to 1919, inclusive, the tax deed to Huffman, the deed from Huffman to Hardie for a one-quarter interest, with the information that the title to the property stood in Huffman as to three-fourths interest and in Hardie as to one-fourth interest, and that the recorder was unable to find any record of the trust deed he mentioned. Shearer testified that he made no further inquiries, that he never paid any taxes on this property, and that he then considered the matter closed.

On June 18, 1927, the defendants executed and delivered to the Superior Oil Company an oil lease covering the property in question. On August 17, 1927, the defendants commenced a suit in the Superior Court of Fresno County against J. Foster Kell and his wife, asking that their title to the property in question be quieted. A notice of *lis pendens* was filed and on December 3, 1927, a judgment was entered quieting their title in the property as against said Kell and his wife. On September 20, 1929, the Superior Oil Company commenced operations in connection with drilling a well under the lease above mentioned, and the first well was brought in on September 4, 1930. Up to the time this action was commenced, the Superior Oil Company had spent practically a million dollars on this property, under the terms of the lease referred to. On March 4, 1916, the charter of the British Californian Oil Company, Ltd., was forfeited to the state for nonpayment of its license tax. The term of the original charter expired by limitation on May 28, 1926, and the same was never renewed.

This action was begun on October 3, 1930, by the plaintiffs as the former directors and the statutory trustees of the British Californian Oil Company, Ltd. A complaint in intervention was filed by certain of the stockholders in this company for and on behalf of all of the stockholders. Appropriate pleadings were filed by the defendants and after a trial on the merits the court found in all respects in their favor and entered a judgment to the effect that neither the plaintiffs nor the interveners had any right, title or interest in or to the property in question or any part thereof, and quieting title thereto in the defendants. From this judgment the plaintiffs and interveners have appealed.

The appellants contend that the tax deed acquired by the respondents in 1920 is void for a number of reasons, and that certain defects in the deed itself and in the tax sale proceedings leading up thereto have not been cured by the two corrective deeds later executed or by the curative act passed by the legislature in 1929 (see Stats. 1929, at p. 745). We regard the questions thus presented as exceedingly close, but, under the view we take of the point next considered, it is unnecessary to discuss or decide the same.

Whether or not it is insufficient to establish title in the respondents, the record contains uncontradicted evidence to the effect that the respondents believed that they had acquired good title to the land under this deed and acted in accordance with this belief; that they represented themselves to be the owners of the land and at all times claimed title thereto; that acting in this belief and in good faith they visited the land each year thereafter and each year leased the land to a tenant for grazing purposes; and that, in 1927, they leased the land for oil development purposes and guaranteed their title. Under these circumstances, irrespective of its validity, this tax deed was entirely sufficient to constitute color of title (*Wilson* v. *Atkinson,* 77 Cal. 485 [20 Pac. 66, 11 Am. St. Rep. 299]; *Simmons* v. *McCarthy,* 128 Cal. 455 [60 Pac. 1037]; *Goodrich* v. *Mortimer,* 44 Cal. App. 576 [186 Pac. 844]). The main and, we think, the determinative question here presented is as to whether the possession taken by the respondents under this claim of title was sufficient in kind and sufficiently open, notorious, hostile and exclusive over a period of at least five years, to ripen into a title by adverse possession. We think this question must be resolved in favor of the respondents.

The appropriate portion of section 323 of the Code of Civil Procedure reads as follows:

"What constitutes adverse possession under written instrument or judgment. For the purpose of constituting an adverse possession by any person claiming a title founded upon a written instrument, or a judgment or decree, land is deemed to have been possessed and occupied in the following cases: . . .

"3. Where, although not inclosed, it has been used for the supply of fuel, or of fencing timber for the purposes of husbandry, or for pasturage, or for the ordinary use of the occupant; . . . "

■ Possession by a tenant inures to the benefit of one claiming by adverse possession and his own personal occupation is not required (*Weyse* v. *Biedebach,* 86 Cal. App. 712 [261 Pac. 1086]; *Dodge* v. *Yates,* 76 Cal. 251 [18 Pac. 323]).

■ To establish adverse possession it is only necessary that land be put to such use as can reasonably be made thereof, and such a use is sufficiently continuous if, during the required time, it be so used at all times when it can be used for the purpose to which it is adapted (*Myers* v. *Berven,* 166 Cal. 484 [137 Pac. 260]; *Posey* v. *Bay Point Realty Co.,* 214 Cal. 708 [7 Pac. (2d) 1020]). ■ It is well settled in this state that pasturing during the entire grazing season of each year during which feed is available, if done to the exclusion of others, is a sufficient use and occupation of land, which is reasonably fit only for pasturage purposes, to constitute the occupation and possession necessary to establish a title by adverse possession (*Webber* v. *Clarke,* 74 Cal. 11 [15 Pac. 431]; *Marshall* v. *Beysser,* 75 Cal. 544 [17 Pac. 644]; *Andrus* v. *Smith,* 133 Cal. 78 [65 Pac. 320]; *Montgomery & Mullen Lumber Co.* v. *Quimby,* 164 Cal. 250 [128 Pac. 402]; *Gibbons* v. *Yosemite Lumber Co.,* 190 Cal. 168 [211 Pac. 4]; *Posey* v. *Bay Point Realty Co., supra; Berry* v. *Cohn,* 47 Cal. App. 19 [189 Pac. 1044]). In *Webber* v. *Clarke, supra,* the leading case in this state, the court said:

"Now, we think that pasturing during the pasturing season is 'appropriate use, according to the particular locality and quality of the property'. To pasture the land when it was 'not pasturable' would not only be not an appropriate use, but an impracticable one. In the case of cultivation, there

is an interval of several months between the harvesting of one crop and the preparation of the soil for another. And there would be just as much sense in holding that the interval destroyed the continuity of the possession in the one case as in the other. To so hold would be in effect to hold for all practical purposes that adverse possession could not be acquired by pasturage. For obedience will be paid to nature's laws rather than to man's, and the thing supposed to be necessary would never be done. It is sufficient that the use is in accordance with the usual course of husbandry in the locality.''

Turning to the record, with these rules in mind, we find the following evidence: The respondent M. D. Huffman testified that immediately after receiving the tax deed he went upon the land and located its boundaries; that he leased it to the Bourdieu brothers for the purpose of pasturing it to sheep; that the land was rough, unfit for cultivation, had been used only for grazing purposes, and was fit only for that use; and that the land was rented to these tenants each year from 1920 to 1929. The Bourdieu brothers testified that they had long been familiar with the land; that they had been grazing sheep over a considerable area, including this land for some years; that prior to 1920 they had allowed their sheep to graze on this land without the permission of anyone, not knowing who was the owner thereof; that when Mr. Huffman came and told them he had bought the land they agreed to rent the same from him; that thereafter they rented the same from him each year until 1929, and during each year pastured large numbers of sheep on this land during the entire grazing season; that as soon as they rented it from Mr. Huffman they established a sheep camp upon this land, which was used as headquarters each year for a large band of sheep while the same were grazing on this land and also on surrounding land; that during the period when feed was available in that vicinity the sheep were brought back to this camp each night; that the camp consisted of a tent for the herder, of a portable salt trough, of equipment for watering sheep, and other supplies; that a herder remained there in charge of the sheep while they were in that vicinity; that they used the pasturage on this land exclusively and kept trespassers away; that they had a sheep camp on this land every spring and every fall of

each year from 1920 to 1929; that they and their herders all referred to this as the "Huffman Camp"; that the grazing seasons consisted of two or three months each spring and about the same time each fall; that these usually lasted from February until March or April in the spring, and during November and December in the fall; that the land could not be used for anything else between these seasons; that no one else occupied or used the land during all of this time; that they recognized Mr. Huffman as their landlord and no one else interfered with their possession; that they lived about a mile and a half from this land; that no one else lived that near, and they were in a position to observe whether anyone else used the land during that time.

Several witnesses testified that they had been herders for the Bourdieu brothers during these years and had occupied the camp on this land; that they stayed on this land continuously at all times when feed was available in that vicinity, bringing the sheep back to this camp every night; that during the times of the year when the land was not so used, neither feed nor water was available there and the land could not be used for any purpose; and that no one else used the land during the grazing season of those years. A number of witnesses testified that they had been in the grazing business in that vicinity during those years; that the various stock owners in that neighborhood knew where each other's ranges were; that there was an established custom whereby owners of sheep or cattle recognized each other's rights to pasture in certain areas; that they refrained from trespassing each on the other; and that they all knew that this particular land was within the range used by the Bourdieu brothers and they did not allow their stock to trespass upon it. There was other evidence that in the event any other stock strayed upon this land the owners were notified and at once came and removed their animals. The evidence is full and complete and, we think, uncontradicted to the effect that the land here in question was used for grazing purposes by the Bourdieu brothers at all times when feed thereon was available, and used as a camp at all times when feed in the neighborhood was available during the entire grazing season of each year from 1920 to 1929, and that no one else was permitted to or did use said land for grazing or any other purpose during all

of this time, until drilling operations were begun by the other tenant.

The appellants virtually concede that the use thus made of this land during these years would have been sufficient to establish a title by adverse possession had this use been by the respondents personally or by any tenant other than the Bourdieu brothers. But they argue that the Bourdieu brothers, prior to the time they rented the same from the respondents, had for some years pastured this land in connection with other lands used by them without the permission of anyone and under no claim of right; that after the issuance of the tax deed they continued to use the land in the same manner as before; and that their use of the land as tenants of the respondents could not inure to the benefit of the respondents until notice of a change in the manner of occupation and use was brought home to the appellants. They rely on a line of cases in which it has been held that a possession and use which has been entered into with the consent of the owner cannot become adverse to such owner without some notice of a changed intention. While the rule just referred to has its proper application in some cases, it neither applies nor controls under the circumstances here appearing. It may first be observed that such use of this land as was made by these tenants prior to the time they leased the same from the respondents was neither with the knowledge or consent of the appellants. During those years they simply allowed their sheep to roam over the land without claim of right. A somewhat similar contention was considered in the case of *Holtzman* v. *Douglas,* 168 U. S. 278 [18 Sup. Ct. 65, 42 L. Ed. 466]. In that case the court said:

"The doctrine which the plaintiff seeks to set up, we think, is not applicable to the facts of this case. After the purchase at the tax sale, the delivery of the deed and the recording thereof, Mrs. Douglas in 1867 claimed title to the land and demanded possession thereof from Rothwell, and by reason of the understanding then arrived at between herself and Rothwell he became the tenant of Mrs. Douglas as the representative of the heirs at law of William Douglas, and such tenancy continued up to the commencement of this action. She went to him under a claim of ownership and of the right to immediate possession of the lot as owner.

He then acknowledged her right, became her tenant, and paid rent to her. That certainly placed Mrs. Douglas, as the representative of the heirs, in possession of the lot. From that time the facts are sufficient upon which to base a claim of adverse possession. We think it was inaugurated when Rothwell, under his agreement with Mrs. Douglas, acknowledged her right and paid her rent, and it was immaterial, so far as the heirs are concerned, that Rothwell had before that time entered upon the lot, although under no claim of title and presumably in subordination to the title of plaintiff's predecessors. (*Harvey* v. *Tyler*, 69 U. S. [2 Wall.] 328 [17 L. Ed. 871].) If Rothwell were himself asserting a title by adverse possession, while coming into possession in acknowledgment of and under the title of the owners, there might be an opportunity for the application of the doctrine contended for by plaintiff, and in such case Rothwell could not set up title by adverse possession while entering in subordination to the title of the owner, unless he first vacated and then retook possession as a hostile entry, or did some act necessarily evincing an intention to put an end to his tenancy. We are not dealing with Rothwell's rights or title. The defendants did all they were called upon to do in order to take possession and inaugurate an adverse holding, when they came with their tax deed, claimed to own the property described in it, and exercised an act of ownership by letting the lot to Rothwell as a tenant at a certain rent. When Rothwell recognized the claim of ownership and remained in possession from that time in subordination to the rights of Mrs. Douglas and the heirs at law, their adverse possession, so far as this point is concerned, was sufficiently inaugurated. Mrs. Douglas was no party or privy to the prior entry of Rothwell, and therefore, whatever the circumstances as proved in this case regarding such prior entry, her rights and those of the heirs cannot be in any way affected thereby. There is no pretense of any fraud or concealment in the case by anyone, certainly not by Mrs. Douglas. Neither she nor the heirs were bound, in order to maintain their rights, to give any written or verbal notice to the former owners that they were in possession through Rothwell; nor did the possession of Rothwell, as tenant of the Douglas heirs, fail to commence at the time of this agreement because he did not

give notice to the former owners of his recognition of the title and right to the possession as claimed by Mrs. Douglas.''

The position of the respondents here is much stronger than was that of the defendants in the case to which we have just referred. Not only did they take possession and lease the land to tenants whose prior use had been without the consent of and unknown to the former owners, but, in addition to the tenancy then for the first time created, a change in the manner of the use of the land then occurred. The evidence shows, without conflict, that prior to the time these tenants leased this land from the respondents they had never had a camp on it, but that immediately thereafter they established a sheep camp thereon and maintained it there during the grazing seasons of each year thereafter. The tenants testified that they did this because they then knew who the owner was and because the land was so situated as to make it desirable and convenient for use as a camp site and as headquarters for the herder. Thereafter, during each grazing season, they not only pastured bands of sheep running into the thousands on this land, but brought the sheep back to this camp each night as long as there was feed available in that vicinity. There is much evidence that the existence of the camp on this site was known to most, if not all, of the sheep and cattle men throughout that country, and a number of witnesses testified that it was called the ''Huffman Camp'', although some witnesses testified that they had never heard it so called. There is also evidence that where large numbers of sheep are kept in a camp of this nature, the droppings from the sheep make such a rich manure that vegetation will not grow there, and that such visible evidence of this particular use of this land always existed and was plainly to be seen up to the time of the trial. The evidence discloses such a change in the use of this land after the delivery of the tax deed as must be held sufficient to take this case out of the rule contended for by the appellants, even if the same would otherwise apply.

In addition to the facts that sheep were pastured on this land during the entire grazing season of each year, that they were at all times in charge of a herder, that the land was exclusively, and continuously, when possible, used by the respondents' tenants, and that no one else was allowed to

trespass thereon, a significant additional use of this land appears in its use as a camp and as headquarters during all of the time feed was available in that vicinity, which must reasonably constitute a better and more complete use than appears in the ordinary case of grazing, which is confined to the land itself and the period of use limited by the amount of feed thereon alone. The possession and use being made of this land was well known throughout all that territory, and physical evidences existed which would have given notice to anyone who visited the land, even at times outside of the grazing season, that the land was being occupied and used. Under the principles of law established in this state and the facts here shown, the respondents have established their title to this land by adverse possession under claim of title, as found by the trial court.

The appellants attack the court's findings and conclusions to the effect that the judgment entered in 1927 in the former quiet title action is binding upon them and conclusive against their interest in this land. It is argued that the deed from the corporation to J. Foster Kell and the agreement which he signed must be taken together as one transaction; that the trust attempted to be created by the agreement is void for indefiniteness; that the deed being a part of the same transaction is also void; that the title to the property then remained in the corporation and now is in the appellant directors as statutory trustees, and that no one having any title was made a party to that action. While the two instruments referred to should be considered together as between the parties thereto, we are neither prepared to hold that this should be done where the rights of a third person are involved, when the deed was recorded and the existence of the agreement was unknown to the third person, nor that the trust thus attempted to be created was, in fact, void. It would seem that even as between the parties there was at least a resulting trust and that the recorded deed, even if voidable, was not void in the sense here contended for. The appellants also rely on certain cases holding that a judgment is not binding on the beneficiaries of a trust when service is had only on the trustee. The cases cited are such as involve the ordinary trust deed given to secure a debt, or trusts of a similar nature, where the instrument itself discloses that there is both a trustee and a beneficiary. In

the case now before us, the deed of record is absolute in form and it is conceded that the respondents had no knowledge, actual or constructive, that the same was in any way qualified. The appellants' only claim as against the judgment referred to is based upon rights assertedly given to them by and through the execution, on the same day as the deed, of what is and always has been, so far as the respondents are concerned, a secret agreement to reconvey the property to someone.

█ Section 1214 of the Civil Code, as amended in 1895, provides in part that every conveyance of real property is void "as against any judgment affecting the title, unless such conveyance shall have been duly recorded prior to the record of notice of action". Section 1215 of that code defines a conveyance as that word is used in section 1214, and it seems apparent that the unrecorded agreement here referred to comes within that definition of a conveyance. Section 1214 was discussed in *Moore* v. *Schneider,* 196 Cal. 380 [238 Pac. 81], and the language there used is significant although the court withheld an opinion as to whether the rule of this portion of section 1214 should be applied in a case in which a prior grantee was not made a party to the action. More persuasive reasons might well be advanced for applying the rule referred to in a case where an interest affecting the title to property is created by one instrument which is not recorded, while at the same time a grant deed is placed on record ostensibly conveying the absolute title, than for applying the same in a case where the property has actually been conveyed to a prior grantee, but where nothing has been done to affirmatively mislead a third party. There might well be equities in favor of a grantee who merely fails to record his deed which would not exist in favor of persons claiming under a secret agreement who have, as a part of the same transaction, executed and recorded a conveyance appearing on its face to be absolute. However, no further discussion is here needed since it is unnecessary to decide the question referred to in view of the other facts here appearing. Whether or not this prior judgment was conclusive as against all of the appellants, it was binding on the one who held the record title, who was made a party to that action, and the respondents have established a title by adverse possession as against the

others who claim under this secret agreement with the record owner.

For the same reason it is unnecessary to consider at length or to decide the questions raised by the appellants' attacks on certain other findings and conclusions to the effect that the claims of the appellants are barred by the various statutes of limitation, that the appellants have been guilty of laches and that they are now estopped from claiming title as against the respondents. It may be observed that the highly technical points raised are not such as to greatly appeal to a court of equity under the facts shown by the record. What purported to be an absolute grant deed based upon and containing an adequate resolution passed by the board of directors of the corporation then owning the land, was executed and recorded. The purported trust agreement was withheld from record for nearly seventeen years and until long after other rights had accrued. Nearly all of the directors, now the trustees, of this corporation testified that they regarded this property as practically worthless. No taxes were paid for all those years and nothing else was done in connection with the land, even though one of the directors ascertained as early as 1925 that the respondents held a tax deed and were paying the taxes on the property. No other inquiries were ever made and the recorded tax deed, notice of *lis pendens*, quiet title judgment and even actual knowledge that the respondents had acquired such a tax deed were all insufficient to arouse any action on the part of the appellants, not one of whom during all of those years paid or offered to pay any taxes, visited the property or did anything else to indicate any interest therein or any claim thereto. The discovery of oil, however, nearly seventeen years after the deed to Kell was recorded, nearly nine years after the final tax sale, nearly five years after one of the directors and trustees obtained actual knowledge of the existence of the tax deed, and nearly three years after the judgment was entered in the former quiet title action, was more effective and brought this action within a month. It is sufficient to say here that the evidence relied upon as supporting the findings relating to limitations, laches and estoppel as against the appellants, if not sufficient for that purpose, is entirely sufficient to indicate and illustrate the wisdom of the rules permitting

a purchaser at a tax sale, who in good faith takes possession of land and assumes the burdens incident to ownership thereof, to establish his title by adverse possession.

For the reasons given the judgment is affirmed.

Marks, J., and Jennings, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court, of Appeal, was denied by the Supreme Court on May 7, 1934.